IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
July 13, 2001 Session

## DONALD MILLER, ET AL. v. CHOO CHOO PARTNERS, L.P.

**Appeal from the Circuit Court for Hamilton County**
**No. 99CV0720      Samuel H. Payne, Judge**

**FILED NOVEMBER 5, 2001**

**No. E2001-00007-COA-R3-CV**

---

Donald Miller and his wife, Terry Miller, filed suit seeking damages associated with injuries that Mr. Miller[1] allegedly sustained when he fell while getting into a bathtub enclosure at a hotel owned by the defendant Choo Choo Partners, L.P.  The jury returned a verdict for the plaintiffs.  As remitted by the trial court, Miller was awarded $1,000,000 and his wife was awarded consortium damages of $175,000. The defendant appeals, arguing, *inter alia*, that it was entitled to a directed verdict because the plaintiffs failed to establish that the defendant's negligence caused Miller's back and neck injuries.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., joined.  D. MICHAEL SWINEY, J., filed a dissenting opinion.

Donald W. Strickland, Chattanooga, Tennessee, for the appellant, Choo Choo Partners, L.P.

John D. McMahan, Chattanooga, Tennessee, and Donald Capparella, Nashville, Tennessee, for the appellees, Donald Miller and Terry Miller.

**OPINION**

I.

The plaintiffs reside in Peoria, Illinois.  At the time of the subject incident, Miller was employed by Komatsu Mining Equipment as an area service manager.  On April 1, 1996, he traveled

---

[1]When we refer to "Miller" in this opinion, we are referring to the injured party.

1

to Chattanooga for the purpose of demonstrating some of his company's large mining trucks to a pool of potential customers. He checked into the Chattanooga Choo Choo Hotel, a hotel owned by the defendant. On the morning of April 2, 1996, as Miller was stepping into the bathtub to take a shower, he grabbed a bar located on the opposite wall inside the bathtub. The bar pulled away from the wall, causing him to fall backwards. As a result of his fall, his right hip struck the edge of the bathtub.

Upon his return to Peoria on April 11, 1996, Miller went to see his family physician, Dr. Richard Schock. He complained of low back pain. He told Dr. Schock of his fall in the hotel bathroom. Dr. Schock examined him and found that he was tender in the lumbar area. He prescribed pain medication, muscle relaxants, and anti-inflammatory drugs. When Miller did not improve, Dr. Schock ordered a MRI scan. The scan showed a disc herniation in the lumbar region of Miller's back. Dr. Schock referred Miller to Dr. Richard Lister, a neurosurgeon who had previously performed surgery on Miller in 1991 to correct another disc herniation in his back. The same doctor had also operated on Miller's neck in 1992. Dr. Lister initially recommended physical therapy and steroid injections. When Miller's condition did not improve, Dr. Lister recommended surgery. On May 16, 1996, Dr. Lister performed surgery to correct the disc herniation in Miller's low back. He indicated at trial that the herniation was in the same location as the herniation that had been the subject of the 1991 surgery.

Miller returned to work on July 24, 1996. He continued to experience back pain, however, and in September, 1996, he returned to Dr. Schock. Another MRI scan of his back was conducted, but nothing unusual was found. Dr. Schock prescribed physical therapy.

Miller testified that he also experienced neck pain after his fall. He testified that he did not mention this pain to either Dr. Schock or Dr. Lister, initially believing it was simply a symptom of fatigue. In January, 1997, he went to Dr. Schock for treatment of his neck. Dr. Schock recommended a MRI scan of his neck. The MRI revealed evidence of a disc herniation at the same location as the herniation that was the subject of the earlier neck surgery. Miller was again referred to Dr. Lister, who performed surgery to correct the herniation on March 18, 1997. Miller did not return to work after the neck surgery. He testified that his ability to perform the duties of his job was "extremely hampered" after the surgeries on his back and neck.

II.

As previously indicated, the jury returned a verdict in favor of the plaintiffs. The trial court remitted Miller's award to $1,000,000 and that of Mrs. Miller to $175,000. The defendant appeals, raising the following issues:

> 1. Did the trial court err in refusing to grant the defendant's motion for directed verdict, which motion was based upon the alleged failure of the evidence to establish the requisite causation nexus between Miller's fall and his neck and back injuries?

2. Did the trial court err in admitting expert testimony over the defendant's objection?

3. Did the trial court err in admitting evidence of Miller's medical expenses over the defendant's objection?

4. Is the jury's verdict excessive as being contrary to the law and the properly-admitted evidence?

5. Did the trial court err in refusing to give the defendant's special requests for jury instructions?

The plaintiffs' brief responds to the defendant's issues. As a separate issue, the plaintiffs contend that the trial court erred in remitting Miller's award from $1,500,000 to $1,000,000 and Mrs. Miller's verdict from $250,000 to $175,000.

### III.

### A.

The defendant contends that it was entitled to a directed verdict because, according to the defendant, the plaintiffs did not prove the defendant's negligence caused the injuries to Miller's back and neck.

### B.

Our standard of review of a trial court's decision on a motion for directed verdict is well-settled. A directed verdict is appropriate only when the evidence is susceptible to but one conclusion. *Eaton v. McLain,* 891 S.W.2d 587, 590 (Tenn. 1994); *Long v. Mattingly,* 797 S.W.2d 889, 892 (Tenn. Ct. App. 1990). In deciding whether this is the situation in a given case, we must "take the strongest legitimate view of the evidence favoring the opponent of the motion." *Long,* 797 S.W.2d at 892. In addition, all reasonable inferences in favor of the opponent of the motion must be allowed, and all evidence contrary to the opponent's position must be disregarded. *Eaton,* 891 S.W.2d at 590; *Long,* 797 S.W.2d at 892.

As a general rule, the causation of a medical condition must be established by testimony from a medical expert. *Thomas v. Aetna Life & Cas. Co.,* 812 S.W.2d 278, 283 (Tenn. 1991). Such testimony is not sufficient to establish causation if it is speculative in nature. *Primm v. Wickes Lumber Co.,* 845 S.W.2d 768, 771 (Tenn. Ct. App. 1992). Quoting extensively from Professor Prosser and other authorities, the Supreme Court has opined as follows:

> "The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct

3

of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant...The plaintiff is not, however, required to prove the case beyond a reasonable doubt. The plaintiff need not negative entirely the possibility that the defendant's conduct was not a cause and it is enough to introduce evidence from which reasonable persons may conclude that it is more probable that the event was caused by the defendant than that it was not..." Prosser [and Keaton, *Torts*, § 41, p. 269 (5th ed. 1984)].

"A doctor's testimony that a certain thing is *possible* is no evidence at all. His opinion as to what is possible is no more valid than the jury's own speculation as to what is or is not possible. Almost anything is possible, and it is thus improper to allow a jury to consider and base a verdict upon a 'possible' cause of death." **Palace Bar, Inc. v. Fearnot,** 269 Ind. 405, 381 N.E.2d 858, 864 (1978). "The mere possibility of a causal relationship, without more, is insufficient to qualify as an admissible expert opinion." **Kirschner v. Broadhead,** 671 F.2d 1034, 1039 (7th Cir. 1982).

The admissibility of an expert medical opinion, of course, should not turn on whether the testifying physician characterizes a particular potential cause of an injury as "conceivable," "possible" or "probable." *See* **Trapp v. 4-10 Investment Corp.,** 424 F.2d 1261, 1268 (8th Cir. 1970). Regardless of the term employed, if the physician's

> "testimony is such in nature and basis of hypothesis as to judicially impress that the opinion expressed represents his professional judgment as to the most likely one among the possible causes of the physical condition involved, the court is entitled to admit the opinion and leave its weight to the jury." **Norland v. Washington General Hospital,** 461 F.2d 694, 697 (Cir. 8, 1972).

Nevertheless, a mere possibility is not an affirmative basis for a finding of fact. "In the language of the law of evidence, [a medical opinion suggesting] that which is merely possible, standing alone and not offered as auxiliary or rebuttal testimony is immaterial to the ascertainment of the fact and so is inadmissible as evidence of that

fact." ***Martin v. United States,*** 284 F.2d 217, 219 (D.C. Cir., 1960). ***Kirschner v. Broadhead,*** *supra,* 671 F.2d at p. 1039-1040.

***Lindsey v. Miami Dev. Corp.,*** 689 S.W.2d 856, 861-62 (Tenn. 1985) (emphasis in original).

C.

The plaintiffs maintained at trial that Miller sustained injuries to both his back and neck as a result of his fall at the defendant's hotel. To establish causation of these injuries, they presented the video deposition testimony of Dr. Richard Schock and Dr. J. Richard Lister. Regarding Miller's back injury, Dr. Schock testified as follows:

> Q        During the course of your care and treatment of Mr. Miller between April 11, 1996, and September 26, 1996, did you reach an opinion according to a reasonable degree of medical certainty as to the cause of his back problems that you were treating him for during that period of time?
>
> A        *I felt that the back problem that I saw him for in April was caused by the fall in the [hotel].*

(Emphasis added). On redirect examination, Dr. Schock testified as follows:

> Q        Mr. Strickland has asked you whether Mr. Miller ever told you that his neck problems were related to the fall. And what I'm asking you is simply whether the causal connection or the determination whether an injury or trauma can exacerbate or aggravate a preexisting degenerative disc disease in a patient with a surgical history such as Mr. Miller is a determination for a physician or a determination for a layperson.
>
> A        I definitely feel that – even with his back, he came in complaining of his back, and for me to – on this first evaluation I didn't feel it was a herniated disc. And we treated him conservatively hoping that it wasn't and that it would improve with just rest and anti[-]inflammatories and so on. And the pain persisted and increased, he had some sciatic irritation. So we proceeded with an MRI.
>
> And sometimes injuries don't expose themselves for sometime after the accident. So I cannot say with any, you know, certainty that, yes, the herniated disc was exacerbated by the fall. But I can say that the fall could have exacerbated the herniation.

5

Q And that's about – you're talking about the neck herniation?

A Both of them.

On the subject of Miller's back injury, Dr. Lister testified as follows:

Q Is the difficulty that this gentleman had in his lumbar spine that you saw him for in April and May consistent with a fall that he described to you?

A It could be.

On redirect examination, Dr. Lister further testified as to the cause of Miller's back injury:

Q In your opinion, Dr. Lister, is it more likely than not that the recurrent disc disease in the lumbar spine was caused as a result of the fall he described to you?

A I don't know what caused his recurrent disc herniation. *Based on his history, the two are related*, but I don't know what caused the disc herniation.

(Emphasis added).

Dr. Schock testified that he "felt that the back problem...was caused by the fall." Dr. Lister opined that the fall and the "recurrent disc disease in the lumbar spine" are related. Dr. Lister also testified that the disc herniation in Miller's back "could be" consistent with his fall. It is true that Dr. Lister testified that he did not know "what caused the disc herniation." But this testimony can be legitimately construed as a statement by the doctor that he did not know what caused this condition *originally*. This is the "strongest legitimate view" of this evidence in favor of the plaintiffs, *see **Long***, 797 S.W.2d at 892; on a motion for directed verdict, they are entitled to that "view." ***Id***. Neither Dr. Schock nor Dr. Lister expressly disavowed their testimony that there was a causal relationship between the fall and the back injury. To the extent that other testimony by these doctors tended to dilute or lessen the effect of their "relationship" testimony, that other testimony goes to the weight to be given their "causal relationship" testimony. This weighing process was for the jury. We certainly are not permitted to say that their "causal relationship" testimony was, as a matter of law, *negated* by their other testimony.

The defendant was not entitled to a directed verdict on the plaintiffs' claim that the negligence of the defendant caused or contributed to the current condition in Miller's low back.

6

D.

We now turn to the evidence regarding Miller's neck injury. On this issue, Dr. Schock testified as follows:

> Q  Dr. Schock, would you describe for the jury at this stage how a gentleman, a man such as Mr. Miller who had had a previous neck surgery is susceptible to subsequent injury?
>
> MR. STRICKLAND:  Object to the form of the question.
>
> Q  You may answer it, Dr. Schock. If he is susceptible. If a party who has had previous neck surgery is not more susceptible to trauma, please tell us.
>
> MR. STRICKLAND:  Same objection.
>
> A  I definitely feel that Mr. Miller has, you know, what we call degenerative disc disease – and this is something that's probably hereditary or genetic – and that he has a predisposition to having back and neck problems.
>
> Definitely a fall can aggravate the condition and cause him to have the herniated disc show up after the injury and would – the – where a fall or the same type of injury in somebody who didn't have degenerative disc problems may not sustain the same type of injury.
>
> Q  Given Mr. Miller's history and given your physical evaluations in 1996 and then in early 1997, can you state, Dr. Schock, within a reasonable degree of medical certainty whether the fall he described to you in April of 1996 at the Chattanooga Choo-Choo, formerly a Holiday Inn, did or did not aggravate or exacerbate this gentleman's preexisting neck problem?
>
> *       *       *
>
> A  I – I definitely cannot put a – say that the fall caused it. He definitely has a predisposing condition that would make him susceptible to that type of an injury from a fall.
>
> Q  Are the symptoms that you observed and that he described to you in January of 1997 consistent with an individual who has suffered an exacerbation of a neck problem from a traumatic or injuring event?

7

MR. STRICKLAND:     Object to the form of the question.

A       The symptoms he's – I'm – the symptoms he's having, could they be brought on by his fall –

Q       Yes, sir.

A       – is basically what you're asking?

Q       Yes, sir.

A       Yes, they could be.

Q       And is that opinion stated according to a reasonable degree of medical certainty?

MR. STRICKLAND:     Object to the form of the question.

A       Yeah.  Yes.

Dr. Schock's testimony regarding Miller's neck injury is clearly not as strong as the testimony regarding his low back injury.  The issue for us is whether, given "the strongest legitimate view of the evidence" in favor of the plaintiffs, *see id.*, there is sufficient evidence of causation between Miller's fall and the neck injury for which the plaintiffs are seeking compensation.

It is clear from the above-quoted testimony that the *origin* of Miller's degenerative disc disease, is "probably hereditary or genetic."  This testimony is consistent with the plaintiffs' theory that Miller's fall aggravated a *pre-existing* condition.  It is likewise clear from Dr. Schock's testimony that such a pre-existing condition renders a person such as Miller "more susceptible to trauma," *i.e.*, more susceptible to injury than one "who didn't have degenerative disc problems."  In response to a question as to whether Miller's fall "did or did not aggravate or exacerbate [Miller's] pre-existing neck problem," Dr. Schock opined that he could not say that the fall "caused" his condition.  This, of course, is consistent with the doctor's testimony that his degenerative disc disease is "probably" something he was born with.  The remainder of the doctor's answer is at the crux of the issue before us:

> He definitely has a predisposing condition that *would make him susceptible to that type of injury from a fall.*

(Emphasis added).  When this answer is viewed in the context of the question that prompted it, we find that it can be interpreted as an affirmative answer to that question.  Certainly, it is subject to another interpretation – one that is favorable to the position of the defendant; however, if this testimony can be reasonably interpreted as an affirmative response to the question posed, we must

adopt this latter interpretation on the issue of whether a directed verdict was appropriate in this case. This is because, once again, our mandate is to view the evidence in a light "favoring the opponent of the motion," *i.e.*, the plaintiffs. ***Id***.

The excerpts from the transcript, upon which we have just commented, were followed by Dr. Schock's testimony indicating that there "could" be a finding of consistency between the symptoms to which Dr. Schock responded and "an individual who has suffered an exacerbation of a neck problem from a traumatic or injuring event." We find that the defendant is making too much of the word "could" in the context of the medical testimony *in this particular case*. That testimony can be interpreted as an expression of opinion to the effect that there "could" be a relationship, *speaking hypothetically*, between the *type* of injury and the *type* of incident involved in the instant case. Such a statement regarding a hypothetical situation is not enough to render Dr. Schock's testimony ineffective on the issue of the causation of Miller's neck injury. Again, the weighing of the testimony was for the jury.

When all of Dr. Schock's testimony is read in context, and when it is viewed in a light most favorable to the plaintiffs, we cannot say that there is no testimonial basis upon which a jury could render a verdict for the plaintiffs on the issue of whether the fall at the hotel caused Miller's neck problems. To borrow the language of Professor Prosser as cited in the ***Lindsey*** case, we find that Dr. Schock's testimony "affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result." ***Lindsey***, 689 S.W.2d at 861.

With all due respect to our colleague, Judge Swiney, we believe that he is putting too much emphasis, in this particular case, on the doctors' use of the word "could." This approach is exactly what the ***Lindsey*** case cautions against: "The admissibility of an expert medical opinion, of course, should not turn on whether the testifying physician characterizes a particular potential cause of an injury as 'conceivable,' 'possible' or 'probable.'" ***Lindsey***, 689 S.W.2d at 862.

We would agree with Judge Swiney if the testifying doctors had said, in so many words, "I cannot say that the fall caused the condition for which I treated the plaintiff. The most I can say is that the fall could have resulted in that condition." Clearly, if this had been the testimony, it would have been insufficient to ward off the defendant's motion for directed verdict. But this is not what we are dealing with in this case. Rather, we have before us expert testimony that tends to establish causation on the one hand, and other testimony by the same experts that tends to diminish the effect of their causation testimony. In our judgment, the latter testimony goes to the weight to be given the former testimony. We believe it was for the jury to sort all of this out.

It is unreasonable to expect a medical expert to testify with legal precision. This is not to say that his or her testimony does not have to meet a certain standard; clearly under ***Lindsey,*** it does. But such testimony must be viewed as the testimony of a medical person and not that of an individual trained in the law. We are expecting too much if we think that doctors can speak with the precision of a hornbook on causation.

9

Judge Swiney's dissent opines that Dr. Lister's testimony that "the [the fall and the plaintiff's condition] are related" does not establish causation. He emphasizes the testimony – "I don't know what caused his recurrent disc herniation" – but gives short shrift to what follows in the doctor's testimony – "I don't know what caused the disc herniation." We continue to believe that this last statement can be construed as Dr. Lister's frank admission that he did not know what caused the disc herniation to *first* manifest itself going back to the time of the original back injury in 1991; rather than an expression of ambivalence as to the cause of Miller's *current* back condition. In any event, we believe there are two ways to view this testimony. One is favorable to the movant – the defendant – while the other is favorable to the nonmovant – the plaintiff. With all due respect to our colleague, we believe he has selected the former. We believe the latter one is the appropriate one for us to select in view of the rule favoring the interpretation that is consistent with the position of the nonmovant on directed verdict.

We also note that Judge Swiney's dissent fails to give sufficient deference to Dr. Schock's straightforward testimony that he "felt that the back problem that [he] saw [Miller] for in April was caused by the fall in the [hotel]." We do not believe we are at liberty to ignore this particular testimony.

We adhere to our opinion that when the evidence is viewed in the light most favorable to the plaintiffs as the nonmovants and when they are given the benefit of all reasonable inference, the evidence is sufficient to make out the necessary *Lindsey* causation.

The trial court did not err in refusing to grant the defendant a directed verdict on the causation issue with respect to Miller's neck condition.

E.

Having found that the expert testimony of Dr. Schock and Dr. Lister was sufficient to establish the relevant causation of Miller's back and neck injuries, we conclude that Dr. Schock's and Dr. Lister's testimony regarding causation was properly admitted by the trial court.

The defendant contends that the trial court erred in admitting the doctors' testimony on other grounds. Specifically, it objects to Dr. Lister's testimony, wherein, after stating that Miller told him that the back injury resulted from the fall, Dr. Lister testified that he had no reason to question Miller's veracity and that he had found him "to be an honest and truthful historian." While such testimony may well have been improper, we find its admission was, at most, harmless error. *See* Tenn. R. App. P. 36(b).

The defendant also takes exception to a question posed to Dr. Schock, in which the doctor was asked "how" a person, such as Miller, who has had prior neck surgery is more susceptible to subsequent injury. The defendant contends that this question was leading and therefore improper. However, we note that before Dr. Schock could respond to the question, the plaintiffs' counsel rephrased the question and asked the doctor "if" a person with a previous neck surgery is more

susceptible to trauma, to which Dr. Schock responded in the affirmative. The objectionable language having been cured, we see no basis for the defendant's complaint. This issue is without merit.

IV.

Next, the defendant contends that the trial court erred in the admission of evidence relating to Miller's medical expenses. The defendant argues that because the plaintiffs failed to establish the causation of Miller's neck injury, the medical expenses related to this injury should have been excluded. It further contends that the testimony of Dr. Schock and Dr. Lister was insufficient to establish the necessity and reasonableness of many of these expenses.

We disagree on both points. As we have already found that the expert testimony sufficiently established the causation of Miller's neck injury, those expenses related to his neck injury were properly admitted. Moreover, we find that the plaintiffs presented sufficient proof of the necessity and reasonableness of Miller's medical expenses. Both Dr. Schock and Dr. Lister testified that the services they personally rendered to Miller were necessary and that their charges were reasonable. Moreover, both doctors testified as to the necessity and reasonableness of the medical charges of other health providers. Upon reviewing the doctors' testimony, we find that there is sufficient evidence to establish the necessity and reasonableness of the $30,534.91 in medical expenses claimed by Miller. However, even if the doctors' testimony was inadequate as to some of the expenses claimed, such a finding would not prompt us to find the award to Miller to be excessive. This issue is without merit.

V.

A.

The defendant next argues that the verdict as remitted is excessive. We disagree.

Our task with respect to this issue is clear. On a jury verdict, we "are required to take the strongest legitimate view of all the evidence, including all reasonable inferences therefrom, to sustain the verdict; to assume the truth of all the evidence that supports it; and to discard all evidence to the contrary." *Miller v. Williams,* 970 S.W.2d 497, 498 (Tenn. Ct. App. 1998). If there is material evidence to support the trial court's judgment, we must affirm. *Id*.

We find there is material evidence to support the monetary awards in this case. As previously indicated, Miller, age 55 at the time of trial, incurred medical expenses of $30,534.91 as a result of his injuries from the fall – injuries that the medical experts testified were permanent in nature. He further presented evidence that he incurred a total economic loss – as discounted to present value – of $411,846 as a result of his inability to continue his employment. Following his back surgery, Miller was able to return to work briefly; however, he continued to experience back pain, which began to interfere with his ability to climb on equipment and to drive for long distances, duties that were essential to his job.

11

Following Miller's neck surgery, his ability to work was "extremely hampered"; he could no longer carry a briefcase or perform any repetitive stooping or bending. As before, his ability to drive a long distance was diminished, this time because of decreased mobility in his neck. Miller testified that he suffered emotionally from his inability to work, and that he has seen a psychologist for depression. Additionally, the plaintiffs indicated that Miller can no longer perform chores around the house and that he cannot engage in his hobby of restoring automobiles, an activity he often shared with his wife. Miller testified that his mobility is limited to the extent that his wife has to help him put on his socks. The plaintiffs both testified that their intimate life is now limited. In light of this evidence, we cannot say that the verdict as remitted is excessive. There is material evidence to support it.

B.

By way of a separate issue, the plaintiffs contend that the trial court erred in remitting the jury's verdict.

"In personal injury cases, calculation of damages is within the province of the jury." *Grandstaff v. Hawks,* 36 S.W.3d 482, 499 (Tenn. Ct. App. 2000). However, a trial court may suggest a remittitur of the verdict if it determines that the verdict is excessive. *See* T.C.A. § 20-10-102(a) (1994). If the suggestion of a remittitur is refused by the party in whose favor the verdict was rendered, a new trial must be granted. *Grandstaff,* 36 S.W.3d at 499. If the remittitur is accepted under protest, the party may appeal the trial court's finding that the verdict was excessive. *Id.*; T.C.A. § 20-10-102(a).

We review a trial court's remittitur pursuant to Tenn. R. App. P. 13(d). *See* T.C.A. § 20-10-102(b). Accordingly, we must determine whether the evidence preponderates against the trial court's judgment. *Long v. Mattingly,* 797 S.W.2d 889, 896 (Tenn. Ct. App. 1990). Upon reviewing the record, we cannot say that the evidence preponderates against the trial court's determination that the verdict rendered by the jury was excessive and that a remittitur was appropriate in this case. This issue is found adversely to the plaintiffs.

VI.

The defendant argues that the jury was not properly charged regarding the plaintiffs' burden on the issue of causation. The plaintiffs counter that the jury was adequately charged and that even if some errors were made, they are not such as to warrant a new trial.

We review the jury charge in its entirety and as a whole to determine whether the trial judge committed reversible error. *Otis v. Cambridge Mut. Fire Ins. Co.,* 850 S.W.2d 439, 446 (Tenn. 1992); *Grissom v. Metropolitan Gov't of Nashville,* 817 S.W.2d 679, 685 (Tenn. Ct. App. 1991). We will not invalidate a charge if it "fairly defines the legal issues involved in the case and does not mislead the jury." *Otis,* 850 S.W.2d at 446; *Grissom,* 817 S.W.2d at 685. Further, it is not error for a trial court to deny a requested instruction if its substance has already been included in other

portions of the charge. *Otis,* 850 S.W.2d at 445; *Mitchell v. Smith,* 779 S.W.2d 384, 390 (Tenn. Ct. App. 1989). "Where the court correctly charges the law applicable to the case, it is not error to deny a special request that embodies a theory of a party if the court charges in general terms and with clearness sound propositions of law which would guide the jury in reaching a correct decision in the case." *Otis,* 850 S.W.2d at 445. We will not reverse a trial court unless the failure to give a requested charge "more probably than not" affected the judgment. Tenn. R. App. P. 36(b).

Among the instructions that the defendant asked the trial court to charge are (1) that causation of a medical condition must be proven by expert testimony and that the probable cause of the injury must be shown with reasonable certainty and (2) the definition of cause in fact and an instruction that the plaintiffs had the burden of proving that the defendant's negligence was the cause in fact of Miller's injuries. The defendant further requested that the jury be charged that the plaintiffs were required to show by expert testimony (1) that Miller's medical expenses were caused by the defendant's negligence and (2) that such expenses were necessary and reasonable. We will address each of these requested instructions in turn.

We find that the trial court adequately charged the jury as to causation. The court told the jury that it had to determine whether the defendant's negligence was the proximate cause of the plaintiff's injuries before it could find the defendant at fault. The court defined proximate cause as "a cause which in natural and continuous sequence produces the injury and without which the injury would not have occurred." The latter part of this definition – "without which the injury would not have occurred" – correctly identifies cause in fact as an element of proximate cause. As such, there was no need to give an additional cause in fact instruction or otherwise define the term further.

The defendant's proposed instruction regarding the requirement that expert testimony on causation be "reasonably certain" embodies a correct principle of law. However, we do not find that it was error not to instruct the jury as to this principle. That an expert's testimony is "reasonably certain" is said to be a prerequisite to the admissibility of that testimony. *See Lindsey,* 689 S.W.2d at 862. The admissibility of expert testimony is a matter of law for the court, not the jury. *See McDaniel v. CSX Transp., Inc.,* 955 S.W.2d 257, 263 (Tenn. 1997). The trial court did not err in refusing to give this instruction.

Finally, the defendant asserts that the jury should have been instructed that the plaintiffs were "required to present competent expert medical proof that [Miller's] medical expenses were caused by the defendant and that the medical expenses were necessary and reasonable." It further contends that the jury should have been charged that damages could not be awarded for any medical expense not proven by expert testimony to have been caused by the defendant's negligence and to be both necessary and reasonable.

We find no reversible error in the trial court's refusal to give this instruction. As we have already discussed, the trial court's charge adequately addressed the issue of the plaintiffs' burden of proving causation of Miller's injuries. Moreover, our review of the trial court's charge leads us to conclude that it adequately addressed the requirement that the plaintiffs prove that the medical

13

expenses incurred were necessary and reasonable.  While the court did not instruct the jury that the necessity and reasonableness of these expenses must be established by expert testimony, we find this error in harmless in light of our finding, as addressed earlier in this opinion, that the plaintiffs adequately established those facts through the expert testimony of Dr. Schock and Dr. Lister.

VII.

The judgment of the trial court is affirmed.  Costs on appeal are taxed to the appellant, Choo Choo Partners, L.P.  This case is remanded for enforcement of the trial court's judgment and for collection of costs assessed below, all pursuant to applicable law.


_____
CHARLES D. SUSANO, JR., JUDGE