IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
OCTOBER 28, 2009 Session

# SAMUEL S. HAINES v. HENRY COUNTY BOARD OF EDUCATION

**Direct Appeal from the Circuit Court for Henry County**
**No. 2899      Donald E. Parish, Judge**

**No. W2008-02532-COA-R3-CV - Filed February 11, 2010**

This appeal arises out of an auto accident.  The trial court entered judgment in favor of the plaintiff. The defendant appeals, arguing that the plaintiff's evidence was insufficient to prove causation.  We reverse the judgment of the trial court and enter judgment in favor of the defendant.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Reversed**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which HOLLY M. KIRBY, J., and J. STEVEN STAFFORD, J., joined.

Charles M. Purcell, Hailey H. David, Jackson, Tennessee, for the appellant, Henry County Board of Education

Gary J. Hodges, Clarksville, Tennessee, for the appellee, Samuel S. Haines

**OPINION**

## I.  FACTS & PROCEDURAL HISTORY

This case involves an automobile accident that occurred on the afternoon of October 14, 2005, in Paris, Tennessee, on a five-lane roadway.  Samuel Haines ("Plaintiff") was driving his Saturn Vue SUV in the left eastbound lane next to the turning lane, at approximately 40 miles per hour, when the car in front of him came to an abrupt stop.  When Mr. Haines applied his brakes to avoid hitting that car, he was rear-ended by a school bus owned by the Henry County Board of Education.  The vehicle that abruptly stopped in front of Plaintiff was driven by James Russell.  According to Mr. Russell, he was forced to slam on his brakes because an elderly woman with Louisiana tags was driving the wrong way down the eastbound lane.  The elderly woman initially stopped but later left the scene of the accident.

Plaintiff filed suit against the Henry County Board of Education on October 4, 2006.  Plaintiff alleged that the bus driver was negligent in failing to keep a proper lookout and failing to avoid the collision.  Plaintiff claimed that, as a result of the accident, he incurred medical expenses and suffered physical injuries, pain, mental stress, loss of enjoyment of life, loss of income, and loss of capacity to earn income.  The Henry County Board of Education filed an answer denying that the bus driver was negligent and claiming that the unknown driver was the sole proximate cause of the accident.

A bench trial was held on July 9, 2008.  The school bus driver testified that prior to the accident, he was traveling thirty to thirty-five miles per hour, below the speed limit, on his way to pick up children after school.  He could not remember how far he was driving behind Plaintiff's vehicle, but he said it was "a good distance" and that he could see the road between the bus and Plaintiff's vehicle.  The bus driver testified that when he saw Plaintiff's vehicle's brake lights, he slammed on his brakes but was unable to stop.  However, Plaintiff testified that he did not hear any braking by the school bus prior to the impact.  Mr. Russell, who stopped in front of Plaintiff, also testified that he did not hear any tires squealing.  The investigating police officer testified that he did not observe any skid marks on the pavement from the bus.

Plaintiff was 44 years old at the time of the accident.  His two young children were also in the vehicle with him, but neither of them was injured.  Plaintiff was taken to the emergency room, where he was x-rayed, evaluated, and released.  However, the emergency room staff referred Plaintiff to Dr. Eugene Frank Gulish, a board-certified orthopedic surgeon.  Dr. Gulish's deposition was entered into evidence at trial.  Dr. Gulish stated that Plaintiff first presented to his office on October 18, 2005, four days after the accident.  At

that time, Plaintiff informed Dr. Gulish that he had been in a car accident and experienced immediate back and neck pain. Plaintiff's neck pain had largely resolved by the time he saw Dr. Gulish, but he reported that his back pain had persisted and that it occasionally radiated into his left leg. Dr. Gulish said that Plaintiff also reported having sciatica in the past with radiation into his left leg.[1] Dr. Gulish x-rayed Plaintiff and found that two of his vertebral bodies, T-11 and T-12, each had about 10 degrees of compression. He explained this finding as follows:

> The vertebral bodies are the supporting elements of the spine so they're essentially like little blocks sitting one on top of the other with the disks between them and their top and bottom cortices are generally parallel.
>
> If something happens, be it osteoporosis or trauma,[2] then they might get crunched down so that the – that the normal contour of the vertebral body is compressed to some degree.
>
> . . . .
>
> [T]he vertebral bodies are made of trabeculated bone which means like spongy bone so there's a whole bunch of little trabeculae that make that vertebral body.
>
> Somewhere along the way those – some of those trabeculae collapsed, cracked through, so that essentially was a fracture.
>
> The question is, you know, here – this is the first time I saw him with a history of an injury so the question is when did it happen. Did it happen with that injury or had it happened long ago so there was no way to know that at least at that point.

Dr. Gulish testified that "10 degree is not very much" and explained that "a vertebral collapse of just 10 degrees usually does well. The pain goes – especially in a relatively young healthy person does well and it doesn't cause that much of a change in his biomechanics so usually the pain goes away." Dr. Gulish instructed Plaintiff to avoid lifting and bending for six weeks, then to progress with his activities as he could.

Dr. Gulish prescribed Percocet for Plaintiff, but after three days, Plaintiff called Dr. Gulish and requested a different medication, stating that the Percocet was making him too sleepy. Dr. Gulish then prescribed hydrocodone for Plaintiff. Over the next few months,

---

[1] Dr. Gulish explained that sciatica is a layperson's term for radiating pain into the lower extremities, with "the sciatic nerve being the main nerve going to the extremities and so it's called sciatica."

[2] Dr. Gulish said that he generally sees compression fractures in people with osteoporosis, especially elderly females, where the compression is caused by "not one acute trauma, but it's just the activities of daily living, standing up so these trabeculae continue to collapse, not all at once, but continue to collapse . . . ."

Plaintiff had numerous additional appointments with Dr. Gulish, and each time, he reported that he continued to experience back pain. Dr. Gulish performed additional x-rays, which showed no further compression of Plaintiff's vertebrae. Dr. Gulish sent Plaintiff to physical therapy, yet he continued to report pain. Dr. Gulish performed a Dexa scan on Plaintiff and determined that he was osteopenic, which Dr. Gulish described as "kind of a step before [osteo]porosis." Dr. Gulish explained that with osteopenia, the back structures are weaker than expected, and he said that Plaintiff's osteopenia might explain why his vertebrae collapsed.

Dr. Gulish testified that at a January 2006 appointment, Plaintiff reported that he was still hurting, although his gait was normal, his reflexes were symmetrical, and he demonstrated "no objective findings." Plaintiff was still taking hydrocodone, and he requested an additional prescription for a muscle relaxer.

Dr. Gulish had a bone scan of Plaintiff performed on April 5, 2006, because he was concerned that Plaintiff was still reporting pain nearly six months after the accident. Dr. Gulish explained,

> [A] bone scan is injecting an isotope into the body and waiting two hours and that isotope will go to wherever there is a cellular activity in the bone and if there is a fracture, if there's a fresh fracture, then generally the isotope will go there and then when they run the Geiger counter over the body, it picks it up and it's seen as a black area on the film.
> . . . .
> Generally, the uptake in an acute fracture will be present for six months to a year while that fracture is trying to heal . . . .

Dr. Gulish stated that Plaintiff's bone scan showed "no uptake" in his back, meaning that his fractures were healed. When Dr. Gulish was asked whether he could state, to a reasonable degree of medical certainty, whether Plaintiff's compression fractures were related to the car accident, considering the results of the bone scan, Dr. Gulish said, "I can't say for certain that those compressions *didn't* occur with his accident[.]" (emphasis added).

At a May 2006 appointment, Plaintiff continued to complain of pain, but an examination revealed "nothing new." Dr. Gulish's office had received an anonymous telephone call from someone who stated that Plaintiff was selling his pain medication. Dr. Gulish stated that when Plaintiff was confronted about the anonymous phone call, Plaintiff acted surprised but did not deny the allegation. Plaintiff was told that Dr. Gulish would continue to see him as a patient, but he would no longer write him pain medication prescriptions. Dr. Gulish also referred Plaintiff to a pain management doctor, Dr. Charles

Walker, thinking that Dr. Walker would be able to give Plaintiff pain medication by injection if necessary.

Thereafter, Plaintiff quit seeing Dr. Gulish. He first saw Dr. Walker on July 24, 2006, some nine months after the accident. Plaintiff told Dr. Walker that he had "dull pain from his mid-spine down," especially after sitting or driving for more than 30 to 45 minutes, or standing for extended periods of time. He reported that his pain began around the date of the car accident. Dr. Walker referred Plaintiff for a functional capacity exam, which according to Dr. Walker, indicated that Plaintiff did experience pain when lifting. However, Dr. Walker testified that Plaintiff's effort on the exam was found to be "variable," and that the results of the exam "may or may not represent the patient's current maximum functional abilities." The functional capacity evaluation report states that Plaintiff's "pain profile was MODERATE to HIGH with POOR reliability." Dr. Walker testified, though, that he had found Plaintiff to be an honest person, and he said he believed that Plaintiff had been honest with him about his condition. Dr. Walker was prescribing numerous medications for Plaintiff, including, among other things, hydrocodone, methadone, and a muscle relaxant, but he said he had no knowledge of Plaintiff overusing his medications.

Dr. Walker testified that it was his opinion, to a reasonable degree of medical certainty, that the automobile accident caused the back injury for which Plaintiff was being treated. However, Dr. Walker acknowledged that he never reviewed any of the x-rays or objective tests showing Plaintiff's injury. He said he was basing his opinion as to causation solely on the history he had received from Plaintiff himself. Dr. Walker said the history Plaintiff reported was that "he had pain, the initiation of pain that he did not have prior to this wreck, and that that correlated with those compression fractures that were identified at that time." Dr. Walker ultimately said that he would defer to Dr. Gulish on his opinion regarding the cause of the compression fractures.

Dr. Gulish had requested that Plaintiff come see him for a follow-up visit in May 2008, in preparation for his deposition, and at that appointment, nearly three years after the accident, Plaintiff continued to complain of severe low back pain with mild radiation into his left leg. However, additional x-rays revealed no difference in his 10 degree compressions. Dr. Gulish ordered an MRI, but he said it found "nothing" – no bulging disks and no impingement of the spinal cord. Dr. Gulish concluded that Plaintiff had a six percent whole person impairment rating.

Dr. Gulish testified that he was never able to determine why Plaintiff continued to experience pain from the compressions when the bone scan showed that the compressions were not collapsing further, and there was no neurologic injury. Dr. Gulish said that throughout his months of treating Plaintiff, he never found any objective evidence that was

consistent and compatible with the level of pain described by Plaintiff. He then clarified that he did find the two vertebral compressions, which he described as "mild but still there." Dr. Gulish said there are many reasons why people have pain and interpret pain, and he said, "I don't know that he's embellishing it or that he's somehow or other interpreting that pain as being that significant." Dr. Gulish said that Plaintiff always described his pain as coming from the area of the compressions, but he also said that Plaintiff had been "conditioned" and "knows that that's where the fractures are." He said it would be odd to have the "radicular type" pain that Plaintiff described "from a fracture that high up with that small amount of compression so I would say that the radicular pain probably is not coming from the vertebral compressions."

Dr. Gulish said he discussed his concerns with Plaintiff at his last appointment and "asked him if there was any other part of his history that he hadn't told me about, back pain and he emphatically denied ever having sought medical attention for back problems before that injury." Dr. Gulish said his impression of Plaintiff at that last appointment was that he had "chronic, mid and low back pain secondary to motor vehicle accident." However, when asked whether he could state to a reasonable degree of medical certainty whether the compression fractures came from the accident, he said, "I can't know that. I know that there was no uptake six months later. On the other hand, he emphatically denies seeking medical care for his back in the past. I guess if that's true, then it seems like at least the back pain started with the accident." Dr. Gulish reiterated that Plaintiff's self-reported history was that he had no history of back problems for which he had been treated, and that "he had leg pain before but did not indicate that he had ever seen anybody for it."

Dr. Gulish also explained that osteopenic patients lose bone substance so that their bones are not as hard as they should be, and he said "it's possible that just the activities of daily living, bending and lifting and all the things we do could have caused over time those vertebrae to wedge and not – he not even know it." When asked whether it was more likely that Plaintiff suffered his injury in that manner than in the car accident, Dr. Gulish replied, "It's really hard to say. The history I got is this is new and never had pain like this before. If that is a true history, his pain started with the accident and hasn't ended, then I think we have to conclude that whatever happened in that accident was what's causing his pain if that is true." In conclusion, Dr. Gulish was asked by Plaintiff's counsel whether he was saying that Plaintiff's injury and pain were *not* the result of the car accident. Dr. Gulish said he was not, explaining, "As I said, the history he gave me is that this pain started on the day of his injury and continued such – since if that's true, then it seems like the accident caused the pain. Whether or not the vertebral body compressions occurred on that day, it seems like the pain occurred on that day if the history is true."

Plaintiff testified that he was not experiencing "any kind of pain" before the accident,

-6-

that his back pain began immediately after the accident when his car came to a stop and he turned around to check on his daughter, and that he had been in continual pain since the accident. Despite Plaintiff's contrary statements to Dr. Gulish, he admitted that he had sought medical care for a back injury prior to the car accident. Plaintiff acknowledged that he had gone to the emergency room complaining of back pain after stepping off a curb approximately five months before the car accident. He said that his pain at that time was just above his belt line in the left part of his back, and that the pain also radiated down his leg. Plaintiff testified that he was given pain medication and told to rest, and the pain went away. Plaintiff said he did not inform Dr. Gulish about the incident because he understood him to be asking whether he had ever suffered back problems "like this" before. However, he said that if Dr. Gulish's records indicated that he reported no back problems, he would not dispute that he made that statement.

During Plaintiff's deposition, he had testified that the curb incident was his only previous back problem. However, when questioned by Defendant's counsel at trial, Plaintiff admitted that he had also gone to a clinic in November of 2004, roughly eleven months before the accident, complaining of "lower back problems." On that occasion, he reported that he was sore from riding in a car and that he had "twisted the wrong way." Plaintiff was prescribed pain medication and sent home.

Plaintiff also admitted that he returned to the clinic in April of 2005, less than six months prior to the accident, complaining of a four-day history of pain from his lower back, radiating into his left leg. Plaintiff reported that he had spent a lot of time in the car, and he was again prescribed pain medications.

Plaintiff also briefly referred to an incident that occurred in the year prior to the accident when he sought medical treatment after stepping down off a ladder, although it is not clear whether this was a separate incident or another reason for his previously mentioned doctor visits. In sum, Plaintiff conceded that he "had some lower back pain before the accident."

Plaintiff also admitted that he had filled numerous prescriptions for hydrocodone during the two years prior to the accident, with the most recent prescription being filled in August of 2005, just two months prior to the accident. Records revealed that Plaintiff had filled prescriptions for over 250 hydrocodone pills between June of 2004 and the time of the accident. Plaintiff admitted that he had a prescription drug problem prior to the accident.

At the conclusion of the testimony, the trial court ruled in favor of Plaintiff and subsequently entered an order incorporating its oral findings. The court's findings relative to causation were as follows:

Dr. Walker is of the opinion that this treatment was made necessary and these injuries caused by the motor vehicle accident of October 14, 2005.

. . . .

. . . [Dr. Walker] acknowledged that he first saw the patient a year after the motor vehicle accident and that his opinion about causation was based in significant part upon the history and, of course, the accuracy of the history being a part of that that the patient/plaintiff had given to him.

Dr. Walker opined that he did not believe there was any evidence of the overuse of pain medications by Mr. Haines during his treatment.

Dr. Gulish first saw the plaintiff on October 18, 2005, just days after this accident. The history being given by the plaintiff was that he had been injured in an automobile accident some four days earlier. He gave a history of back pain radiating into his left leg.

. . . .

. . . [Dr. Gulish] diagnosed a compression fracture at T11 and T12, . . . and he quantified that compression as being 10 percent – or 10 degrees, I should say, at each.

. . . He also ordered sometime thereafter a bone scan to be performed, and the results of the bone scan were that in his opinion he – the result was that he could not say that the compression fractures were or were not caused by the motor vehicle accident simply from the bone scan itself.

He did make an attempt to investigate that depending upon the degree of – of a positive uptake or negative results about the bone scan to make some opinion in terms of the age of the injury.

Dr. Gulish was of the opinion that the plaintiff's reports of pain as time went along during the course of treatment seemed to be excessive for the injury that he was detecting. . . .

. . . .

Dr. Gulish was of the opinion that the objective findings were somewhat inconsistent with the reports of pain that the plaintiff continued to give him. That was his opinion some two years earlier and remained his opinion in May of 2008. . . .

When questioned closely about the genesis for the pain,[Dr. Gulish] acknowledged that the pain apparently started with the motor vehicle accident. He accredited the sincerity of the plaintiff and made no effort to opine that the plaintiff was exaggerating his symptoms. He just felt that the period of treatment with these narcotic drugs was not appropriate. . . .

The court then went on to award damages to Plaintiff of $10,000 for past physical pain, mental suffering, and loss of enjoyment of life; $15,000 for future physical pain, mental

suffering, and loss of enjoyment of life; $8,700 for past medical expenses; $12,000 for past lost earning capacity; and $10,000 for future lost earning capacity. The court found that the Henry County Board of Education was 90% at fault for Plaintiff's injuries, and the unknown driver was 10% at fault. As such, the court awarded Plaintiff $50,130 from the Defendant. The Defendant timely filed a notice of appeal to this Court.

## II. ISSUES PRESENTED

The Defendant presents the following issues for review:

1.  Whether the trial court erred in failing to determine that the unknown driver was the sole proximate cause of the accident;
2.  Whether the trial court erred in finding proof of causation and awarding damages based on such finding of causation;
3.  Whether the trial court erred in awarding damages for lost earning capacity.
4.  Whether the trial court erred in awarding damages for physical pain, mental suffering, permanent impairment, and loss of enjoyment of life.

For the following reasons, we reverse the decision of the circuit court.

## III. STANDARD OF REVIEW

"It is well settled that causation in a negligence case is a question of fact, which we review with a presumption of correctness." *Jones v. Shelby County Div. of Corr.*, No. W2007-00198-COA-R3-CV, 2008 WL 366151, at *5 (Tenn. Ct. App. Feb. 12, 2008) (citing Tenn. R. App. P. 13(d)). On appeal, we will not overturn a trial court's factual finding unless the evidence preponderates against it. Tenn. R. App. P. 13(d) (2008); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)). When the resolution of the issues in a case depends upon the truthfulness of witnesses, the fact-finder, who has the opportunity to observe the witnesses in their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. *Mach. Sales Co., Inc. v. Diamondcut Forestry Prods., LLC*, 102 S.W.3d 638, 643 (Tenn. Ct. App. 2002). However, "[w]hen the issues involve expert medical testimony that is contained in the record by deposition, determination of the weight and credibility of the evidence necessarily must be drawn from the contents of the depositions, and the reviewing court may draw its own conclusions with regard to those issues." *Foreman v. Automatic Sys., Inc.*, 272 S.W.3d 560,

571 (Tenn. 2008) (citing *Orrick v. Bestway Trucking, Inc.*, 184 S.W.3d 211, 216 (Tenn. 2006)).

## IV. DISCUSSION

"As a general rule, the causation of a medical condition must be established by testimony from a medical expert."[3] ***Miller v. Choo Choo Partners, L.P.***, 73 S.W.3d 897, 901 (Tenn. Ct. App. 2001); *see also* ***Hankins v. Chevco, Inc.***, 90 S.W.3d 254, 260 (Tenn. Ct. App. 2002). The testifying physician must be "reasonably certain" as to the cause of the condition. ***Jackson v. Allen***, No. M2000-01673-COA-R3-CV, 2002 WL 661930, at *2 (Tenn. Ct. App. W.S. Apr. 23, 2002); ***Miller***, 73 S.W.3d at 909; ***Primm v. Wickes Lumber Co.***, 845 S.W.2d 768, 771 (Tenn. Ct. App. 1992)). "A doctor's testimony that a certain thing is *possible* is no evidence at all." ***Miller***, 73 S.W.3d at 902 (quoting *Lindsey v. Miami Dev. Corp.*, 689 S.W.2d 856, 861-62 (Tenn. 1985)). "Proof of causation equating to a 'possibility,' a 'might have,' 'may have,' 'could have' is not sufficient, as a matter of law, to establish the required nexus between the plaintiff's injury and the defendant's tortious conduct by a preponderance of the evidence . . . ." ***Ambrose***, 2008 WL 1901207, at *5 (quoting *Kilpatrick v. Bryant*, 868 S.W.2d 594, 602 (Tenn. 1993)). However, the exact terminology used by the expert is less important than the meaning of his testimony as a whole. ***Jackson***, 2002 WL 661930, at *5.

> The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant. . . . The plaintiff is not, however, required to prove the case beyond a reasonable doubt. The plaintiff need not negative entirely the possibility that the defendant's conduct was not a cause and it is enough to introduce evidence from which reasonable persons may conclude that it is more probable that the event was caused by the defendant than that it was not . . . . Prosser [and Keaton, *Torts*, §41, p.269 (5th ed. 1984)].

---

[3] The cause of a medical condition must be established by the testimony of a medical expert in all but the most obvious of cases. ***Ambrose v. Batsuk***, No. M2006-01131-COA-R3-CV, 2008 WL 1901207, at *8 n.3 (Tenn. Ct. App. Apr. 30, 2008) (citing *Thomas v. Aetna Life & Cas. Co.*, 812 S.W.2d 278, 283 (Tenn. 1991); *Smith v. Empire Pencil Co.*, 781 S.W.2d 833, 835 (Tenn. 1989); *Miller*, 73 S.W.3d at 901).

*Miller*, 73 S.W.3d at 901 (quoting *Lindsey*, 689 S.W.2d at 861-62). In sum, the testimony, as a whole, must show that it is more probable than not that the accident caused the injury. *Jackson*, 2002 WL 661930, at *2. The medical testimony is not sufficient to establish causation if it is speculative in nature. *Miller*, 73 S.W.3d at 901; *Primm*, 845 S.W.2d at 771.

In this case, Dr. Gulish testified that he could not say for certain that the compressions *didn't* occur in the car accident. However, he also said he "can't know" to a reasonable degree of medical certainty whether the compressions *did* come from the car accident. Dr. Gulish explained, "I know that there was no uptake six months later. On the other hand, he emphatically denies seeking medical care for his back in the past. I guess *if that's true*, then it seems like at least the back pain started with the accident."[4] (emphasis added). Dr. Gulish said it was "possible" that Plaintiff's compressions were caused by "just the activities of daily living, bending and lifting and all the things we do." He said it was "really hard to say" whether it was more likely that the compressions occurred from normal activities than from the car accident, stating, "The history I got is this is new and never had pain like this before. *If that is a true history*, his pain started with the accident and hasn't ended, then I think we have to conclude that whatever happened in that accident was what's causing his pain *if that is true*." (emphasis added). He later testified that "the history he gave me is that this pain started on the day of his injury and continued such – since *if that's true*, then it seems like the accident caused the pain. Whether or not the vertebral body compressions occurred on that day, it seems like the pain occurred on that day *if the history is true*." (emphasis added).

In short, Dr. Gulish said that he could not know to a reasonable degree of medical certainty whether the accident caused the compressions, but he said that *if the history Plaintiff gave him was true*, then he thought one would have to conclude that the accident at least caused Plaintiff's pain. However, as previously discussed, the history Plaintiff gave Dr. Gulish was clearly untrue. According to Dr. Gulish, Plaintiff told him that he had injured his lower back in the car accident, and he described his pain as occasionally radiating into his left leg. Plaintiff said that his pain was new and that he had never had pain like this before. Yet he admitted at trial that he went to the emergency room five months before the accident after stepping off a curb and experiencing pain in his lower back that also radiated down his leg. He also admitted that he went to a clinic approximately six months prior to the accident, complaining of a four-day history of pain in his lower back, radiating into his left leg, which he attributed to riding in a car. He admitted seeking medical care eleven months before the accident for "lower back problems," and reporting that his pain was due to riding in a car and to "twist[ing] the wrong way." He further admitted recently seeking medical attention due

---

[4] We also note Dr. Gulish's testimony that Plaintiff's radicular pain was probably not coming from the compressions, and that he was unable to find objective evidence that was consistent or compatible with Plaintiff's complaints of pain.

to his stepping down off a ladder. Yet when Dr. Gulish asked Plaintiff whether there was "any other part of his history that he hadn't told [him] about, back pain," Plaintiff "emphatically denied ever having sought medical attention for back problems" in the past.

Again, Plaintiff was required to present medical evidence affording a reasonable basis for the conclusion that it is more likely than not that Defendant's negligence resulting in the accident was a cause in fact of his back problem. We find that Plaintiff failed to do so. We are of the opinion that Dr. Gulish's equivocal medical testimony, which was based upon an incomplete and inaccurate medical history, was insufficient to establish that it is more probable than not that the accident caused Plaintiff's injuries. Dr. Gulish repeatedly qualified his opinion as to causation by stating that it was based upon the assumption that Plaintiff gave him a true history. If Dr. Gulish was unable to say for certain that the accident caused Plaintiff's injuries when he believed that Plaintiff had no history of similar back problems, he surely would have been less certain as to causation had he known that Plaintiff sought medical attention for lower back problems at least three other times in the past year. We recognize that the other physician, Dr. Walker, initially stated his opinion, to a reasonable degree of medical certainty, that the accident caused Plaintiff's injuries. However, his opinion was based solely upon Plaintiff's self-reported history that he was experiencing pain that he did not have prior to the accident. Because Dr. Walker was given an inaccurate history, then his opinion, based entirely upon that information, would also be inaccurate. *See* ***Van Sickel v. Howard***, 882 S.W.2d 794, 796 (Tenn. Ct. App. 1994). Dr. Walker also said that he would defer to Dr. Gulish regarding an opinion as to causation. Therefore, Dr. Walker's testimony does not provide sufficient medical testimony of causation.[5]

---

[5] We note that the Middle Section of this Court has stated that "an inference of causation may be drawn by the trial court where equivocal medical proof is combined with other evidence which supports a finding of causation." ***Pellicano v. Metro. Gov't of Nashville & Davidson County***, No. M2003-00292-COA-R3-CV, 2004 WL 343951, at *7 (Tenn. Ct. App. Feb. 23, 2004) (citing *Taylor v. Dyer*, 88 S.W.3d 924, 926 (Tenn. Ct. App. 2002)). In ***Taylor***, 88 S.W.3d at 926, the Middle Section had held that "[c]ausation may be established by a combination of medical and lay testimony." The Court recognized that the cases it cited for this proposition were worker's compensation cases but opined that the principles would also apply to the auto accident case before it.

Nevertheless, after considering the entire record in this case, we conclude that Plaintiff failed to introduce evidence affording a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of his injury. *See* ***Miller***, 73 S.W.3d at 901.

## V. CONCLUSION

For the aforementioned reasons, we conclude that the evidence preponderates against the trial court's finding of causation. Accordingly, we reverse the decision of the circuit court and award judgment in favor of the Defendant. Costs of this appeal are taxed to the appellee, Samuel Haines, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.