IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 8, 2025 Session

## JACQUELINE PAYNE v. SHELBY COUNTY, TENNESSEE, ET AL.

**Appeal from the Circuit Court for Shelby County**
**No. CT-2256-22     Rhynette N. Hurd, Judge**

————————————————————————

**No. W2024-00641-COA-R3-CV**

————————————————————————

This is an appeal from a trial court's award of damages to the plaintiff after a bench trial in an auto accident case. The trial court declined to award the plaintiff all of the damages she sought because it concluded that her most significant injury, a torn rotator cuff, was not caused by the auto accident at issue. The plaintiff then filed a motion to recuse and to set aside the judgment due to a friendship between the trial judge's son and counsel for the defendant, but the trial court denied the motion. The plaintiff appeals. We affirm in part, reverse in part, and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed in Part, Affirmed in Part, and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and JEFFREY USMAN, J., joined.

Derek O. Fairchilds and Shelby M. Patrick, Memphis, Tennessee, for the appellant, Jacqueline Payne.

Roy Harold Chockley, Jr., and Craig P. Barnes, Memphis, Tennessee, for the appellee, Shelby County, Tennessee.

Gary H. Nichols, Alpharetta, Georgia, for the appellee, Hartford Fire Insurance Company.[1]

## OPINION

### I.  FACTS & PROCEDURAL HISTORY

---

[1] Hartford Fire Insurance Company, the uninsured/underinsured motorist insurance company, adopted the brief of Shelby County.

Jacqueline Payne worked for Signature Healthcare of Memphis as a certified nursing assistant. At around 1:30 p.m. on the afternoon of June 16, 2021, she was accompanying a patient on a medical transport shuttle bus when the bus was involved in an accident. The bus had been stopped at a red light for a few minutes when it was rear-ended by a Shelby County Sheriff's Department patrol car. The following photograph depicts the shuttle bus and the patrol car:



Ms. Payne was seated in the front row on the passenger side of the shuttle bus. According to the investigating officer's bodycam footage, Ms. Payne stated that she was "hurting" after the accident, but she declined an ambulance and stated that she intended to "take [her]self to the doctor."

That evening, Ms. Payne, who was 57 years old at the time, was examined at Baptist Minor Medical Center. Ms. Payne reported being in an auto accident earlier that day in a company van in which she was a restrained passenger and the van was struck from behind at a stop light. She complained of pain from her neck to her low back. Her physical examination revealed tenderness and spasms present in her back, pain with movement, and decreased range of motion. Ms. Payne was diagnosed with neck pain, acute midline low back pain, and elevated blood pressure. She was referred to the emergency room for a full evaluation and instructed to follow up at Baptist Minor Medical once she was cleared by the emergency department.

That same evening, Ms. Payne was examined at the emergency department of Saint Francis Hospital. She again reported being in a rear end collision earlier that afternoon in which she was wearing a lap belt and was "jolted" from the impact. She complained of sharp pain from her neck down to her buttocks, reporting that the degree at onset was minimal but the degree at present was severe (8 out of 10), with movement exacerbating her symptoms. After x-rays of her back revealed no fractures, Ms. Payne was diagnosed with strains of the muscles and tendons in her neck and back. She was prescribed medication for pain and muscle spasms and instructed to follow up with her primary care physician within one to two days or return to the emergency room if her symptoms worsened.

The following morning, which was June 17, Ms. Payne returned to Baptist Minor Medical for a follow-up visit. According to her medical record, she reported "her pain is 8/10 from her neck to low back and right shoulder blade." Her physical examination revealed back spasms, tenderness, and decreased range of motion. Ms. Payne was again diagnosed with neck pain, back pain, and elevated blood pressure. She was instructed to continue her medication and rest. Her workers' compensation paperwork was completed, and she was permitted to return to work at transitional duty with restrictions, such as no lifting more than five pounds, no pushing/pulling, etc. Ms. Payne was instructed to return to Baptist Minor Medical in one week, on June 24, and to return to the emergency room if her symptoms worsened.

When Ms. Payne returned for her follow-up visit on June 24, she reported that her pain was "unchanged" and mild to moderate. She was only working light duty. This time, Ms. Payne was diagnosed with "whiplash injury syndrome." The doctor referred Ms. Payne to physical therapy to evaluate and treat her "pain in limb/spine," with the therapy recommended to occur three times per week for up to two weeks. Ms. Payne was again instructed to return to Baptist Minor Medical for a recheck in one week.

Ms. Payne attended her first appointment with physical therapy on June 30. She reported being in a motor vehicle accident on June 16, which caused her neck and back pain. Ms. Payne described being stopped at a red light when the vehicle was struck from behind, causing her body to go forward then backward very quickly. She reported that she immediately felt neck and back pain. According to her medical record, Ms. Payne reported that "her aching pain is mainly on the R." Despite the medication she was taking for pain, she reported difficulty performing home related activities such as mopping or grocery shopping. When the therapist performed muscle testing of Ms. Payne's upper extremities, he recorded for "Shoulder Internal Rotation" that he was "unable to assess on R due to pain." For the testing of Ms. Payne's upper trapezius muscle, the records state that the therapist was "unable to assess due to muscle guarding."

Ms. Payne returned for her one-week recheck at Baptist Minor Medical the

following day, which was July 1. She reported that she was still experiencing neck and back pain and had started physical therapy but was not getting better. Her doctor contacted the emergency department at Saint Francis Hospital and learned that Ms. Payne had x-rays of her back at the previous ER visit but none of her neck. As such, the doctor advised Ms. Payne that she needed further management of her persistent neck pain at the emergency room. She was instructed to return to the clinic the following morning if she was cleared by the emergency room.

Later that same day, Ms. Payne was evaluated for a second time at Saint Francis Hospital. Her medical records indicate that she again reported a motor vehicle accident on June 16 and that her neck pain had not improved since that date despite taking pain medication. Ms. Payne reported "having painful ROM of her neck with pain that goes into both superior shoulders." A physical examination of her neck revealed "TTP along cervical paraspinal muscles into R shoulder." Additional x-rays showed no fractures. Ms. Payne was ultimately diagnosed with a pinched or bruised nerve in the neck, but she was directed to follow up with "orthopedics" within three to five days. She was given medication for pain, including an injection and a lidocaine patch.

Ms. Payne returned for her follow-up visit with Baptist Minor Medical the following day, on July 2. Her medical records indicate that she was still taking various pain medications and muscle relaxers with no relief, and that she had been "referred to orthopedic for further evaluation and management."

On July 21, Ms. Payne had her first appointment at TriState Orthopaedics, with orthopedic surgeon Dr. Apurva Dalal. Her medical record from that date states that the reason for her appointment was neck, upper back, and right shoulder pain. Dr. Dalal's summary of the patient's history stated:

Patient is a very pleasant 57-year-old African-American female who comes today with complaints of severe pain in her neck, right shoulder and mid to low back. She tells me all of this pain began after a work-related event on June 16, 2021. She states that she works for a nursing facility and while transporting a patient she was sitting in one of the front rows of the bus when the bus was rear-ended by the sheriff's department car. She tells me that they only have lap seatbelts and she went forward upon collision. Following the accident she was sent to Baptist Minor medical by Workmen's Comp. and was referred to start physical therapy. She was told that she was then referred to our office and was told to stop any therapy. She denies any pain prior to this event. She tells me now she has constant pain in her entire back. She is unable to lift her right arm. She cannot sleep on her right side. She is miserable with pain and discomfort. She rates her current pain a 8 out of 10 on a pain scale from 0-10.

- 4 -

Dr. Dalal recorded the following note based upon his examination of her shoulder:

> Examination of the right shoulder shows tenderness over the acromioclavicular joint. There is tenderness of the biceps tendon. Range of motion is painful and limited. Active forward flexion is 90 degrees, abduction is 80 degrees. Crossarm test, impingement test, load shift test, drop arm test, empty can test and supraspinatus test are all positive. Neurovascularly patient is intact.

Given Ms. Payne's complaints and Dr. Dalal's physical examination, his primary assessment was a complete tear of the right rotator cuff, but he ordered an MRI of the right shoulder to confirm his assessment. He also gave Ms. Payne a cortisone injection in her right shoulder. She was instructed to return in three weeks.

Three weeks later, on August 11, Ms. Payne had her second appointment at TriState Orthopaedics. The ordered MRI of Ms. Payne's shoulder had not yet been performed. She complained of continued pain in her neck, low back, and shoulder, in addition to loss of range of motion in the shoulder. Dr. Dalal's physical examination revealed tenderness and showed that her range of motion was "painful and limited." She was instructed to return after the MRI was completed.

On September 15, Ms. Payne returned to TriState after the completion of her MRI. Dr. Dalal's medical record states:

> Patient is a very pleasant 57-year-old African-American female patient who is here today with a complaint of severe pain in the right shoulder. She states the pain is at 10 on pain scale from 0-10. Patient has lost significant motion in the right shoulder. She has difficulty doing overhead work and work away from the body. Pulling, pushing, and lifting are extremely painful and uncomfortable. This has affected her activities of daily living to the point that she cannot even sleep at night because of constant pain in the right shoulder. Patient returns today after MRI of the right shoulder. Her injury was 3 months ago/. and she has progressively lost motion in the right shoulder. She tells me that she cannot continue living like this. Previous complaints of cervical spine, lumbar spine, and hip pain have been noted and discussed again. Currently her biggest problem is her right shoulder.
> . . . .
> Right shoulder examination shows significant loss of motion. This motion was measured with active and passive range of motion which is extremely painful. Her active forward flexion is 80 degrees and abduction is 70 degrees. Cross arm test, impingement test, load shift test, drop arm test, and empty can test all are positive. Neurovascularly she appears to be intact passively when I tried to forward flex her shoulder it is extremely painful and

- 5 -

she cries.

. . . .

9-5-21: MRI right shoulder showed

i. Partial thickness bursal sided insertional tearing of the supraspinatus tendon is noted.

2. No additional discrete rotator cuff tendon tear is seen. Relatively mild appearing infraspinatus and subscapularis tendinosis are present.

3. Proximal biceps tendinosis was noted.

4. Mild appearing subacromial/subdeltoid bursitis.

The medical record reflects that Dr. Dalal discussed the MRI results with Ms. Payne in detail and answered her questions. It also states that the cortisone injection in Ms. Payne's shoulder had only helped "minimally." Dr. Dalal's record states,

> This patient needs to have surgery on the right shoulder for repair of rotator cuff with possible distal clavicular excision, subacromial decompression, and acromioplasty.
>
> . . . .
>
> At this point with a reasonable degree of medical certainty I can state that the progress of this patient will not occur unless surgical intervention is approved for the right shoulder.

The surgery was scheduled for the following week.

On September 21, three months after the June 16 auto accident, Ms. Payne underwent surgery to repair her torn rotator cuff. She then had a period of physical therapy. In January 2022, Dr. Dalal discharged Ms. Payne from his care, noting that she still had moderate pain and loss of motion but had reached maximum medical improvement. He assigned her an impairment rating of six percent impairment to the right upper extremity and four percent of the body as a whole, meaning her injury was permanent in nature.

On June 6, 2022, Ms. Payne filed this lawsuit against Shelby County, Tennessee, and Deputy Vincent Jennings, seeking to recover damages for the injuries she sustained in the accident, including those related to the torn rotator cuff. A consent order was entered dismissing the claims against Deputy Jennings. A bench trial was held in March 2024 before Judge Rhynette Hurd. The trial transcript begins with a brief exchange reflecting that Judge Hurd and counsel for Shelby County, Chip Chockley, were laughing and talking about a chocolate cake recipe.[2] However, nothing more was said about the matter at that

---

[2] The transcript reflects:

(WHEREUPON, the following proceedings were had in open court:)
THE COURT: Mr. Chockley, I told Mr. Fairchilds [Ms. Payne's counsel] about the chocolate cake recipe. (Laughter.)

time, and the trial proceeded as scheduled.

At the outset, Shelby County stipulated that Deputy Jennings was liable for the rear end collision, he was acting in the course and scope of his employment with Shelby County, and any fault assigned to him was imputed to the County. During opening statements, counsel for Ms. Payne suggested that the only issues to be decided were causation and damages. Counsel stated that Ms. Payne was seeking damages for over $65,000 in medical bills, lost wages of nearly $19,000, as well as pain and suffering and permanent impairment. Counsel for Shelby County conceded that Ms. Payne "suffered some sort of injury in this accident," but he suggested that her "course of treatment for such a minor accident was unusually extensive" given that she had eight medical visits primarily focusing on her neck and back, and "[i]t's not until over a month after the accident when she show[ed] up at Dr. Dalal's office at Tri-State Orthpedics that her complaints begin to focus on the shoulder." Counsel for Shelby County asked the court to "review the medical history in this case with a careful eye," given the fact that this was a "low speed impact," Ms. Payne had been in three prior auto accidents and settled those cases, and she asked for the accident report number at the scene.

The trial court heard testimony from Ms. Payne; her live-in partner, Ridley Taylor; Deputy Jennings; and the investigating officer at the scene of the accident, Deputy Michael Lange. In addition, the deposition testimony of Dr. Dalal was read into evidence. We begin with the deposition testimony, as the trial court did.

Dr. Dalal testified that he had been licensed to practice medicine in Tennessee since 2003. He was certified by the American Board of Orthopaedic Surgery. Counsel for Shelby County had no objection to Ms. Payne's motion to qualify Dr. Dalal as an expert witness in the field of orthopedic surgery. Dr. Dalal testified that his specialty was orthopedic surgery, and he particularly specialized in shoulders, hips, and knees. He explained that he had worked in an emergency department for many years and had seen a lot of injuries from trauma and car accidents. Although he had "retired" from the emergency department in 2016, he continued to see patients in his current office with similar injuries. He testified that he had treated patients with the types of injuries sustained by Ms. Payne many times, generally two to three times a week over the course of his career.

Dr. Dalal described Ms. Payne's first appointment at his office on July 21, 2021. He testified that Ms. Payne complained of neck, back, and right shoulder pain, and she told him that all of this pain began after a work-related event on June 16, 2021. Dr. Dalal testified that Ms. Payne explained to him that she worked for a nursing facility and was

---

MR. CHOCKLEY: I haven't had one of those in years.
THE COURT: They are so good.
MR. CHOCKLEY: They are. Your Honor, we have just a short video excerpt that we planned on showing to the Court. I have it on my laptop here. . . .

transporting a patient, sitting in one of the front rows of a bus, when it was rear-ended. He said Ms. Payne also told him that the bus only had a lap seatbelt, and "she went forward upon collision." Ms. Payne informed Dr. Dalal that her workers' compensation carrier had sent her to Baptist Minor Medical Center and to a physical therapist. Dr. Dalal testified that Ms. Payne "denie[d] any pain prior to this event." He testified that she was unable to lift her right arm and reported constant pain in her entire back. Dr. Dalal explained that his physical examination of the right shoulder showed tenderness of the AC joint and biceps tendon, and her active forward flexion was only 90 degrees when it should have been 180 degrees, so Ms. Payne had a 50 percent loss of forward flexion. He testified that her abduction was 80 degrees, with normal being 180 degrees. Dr. Dalal testified that Ms. Payne was doing "extremely poorly as far as her shoulders and her neck and the lower back was like a sprain kind of injury." He testified that he had "clinically . . . recorded" that he felt there was a tear of the rotator cuff at that first appointment, and the subsequent MRI confirmed his clinical diagnosis.

Ms. Payne's counsel questioned Dr. Dalal as follows regarding the cause of her injuries:

> Q.    Doctor, are those injuries consistent with Ms. Payne being involved in this motor vehicle collision on June 16th, 2021?
> A.    Yes, sir.
> Q.    Do you have an opinion whether those injuries were caused by the motor vehicle collision?
> A.    With a reasonable degree of medical certainty I can state that her injuries were caused by motor vehicle accident.

Dr. Dalal explained that Ms. Payne's rotator cuff tendon, where it attached to the bone, was torn. He added, "There was some inflammation in the subacromial/subdeltoid space, but main diagnosis was rotator cuff tear." When asked, again, if he had an opinion as to what caused Ms. Payne's injuries, Dr. Dalal stated, "Her cervical strain, lumbar strain and tear of the rotator cuff on the right shoulder occurred due to the automobile collision."

Dr. Dalal had reviewed all of Ms. Payne's medical records, from Baptist Minor Medical, Saint Francis Hospital, etc., and he opined that all of those records were consistent with the complaints Ms. Payne made to him at her first appointment. He also testified that the injuries diagnosed by the various other providers were consistent with the injuries he diagnosed. Dr. Dalal testified that the medical services provided by him and by the various other providers were necessary for the treatment and evaluation of Ms. Payne's injuries.

On cross-examination, counsel for Shelby County asked Dr. Dalal if Ms. Payne's medical records from other providers reflected any complaints about shoulder pain. Dr. Dalal pointed out that the records from the second visit to the emergency department at Saint Francis specifically described Ms. Payne's complaint of right shoulder pain. When

asked about the records from Baptist Minor Medical, Dr. Dalal noted that Ms. Payne had been diagnosed with a pinched nerve in her neck following a motor vehicle accident. He explained that for a pinched nerve or a shoulder rotator cuff problem, "the pain overlaps." Dr. Dalal testified that it is difficult to determine if the pain is coming from the neck or from the shoulder. He testified that even "sometimes for an orthopedic surgeon we have to give them a numbing shot in the shoulder to figure out whether the pain is coming from here or here. It's hard to figure out." Accordingly, although Dr. Dalal acknowledged that some of the records did not describe the pain specifically as shoulder pain, the records did indicate that she complained of "pain in her neck down to the lower back and complain[ed] of cervical radiculopathy [pinched nerve in the neck], which I told you can mimic a shoulder rotator cuff." Counsel then asked Dr. Dalal if it was "possible" that Ms. Payne could have suffered some other injury to her shoulder in between the date of the auto accident on June 16 and the date he first saw her on July 21. Dr. Dalal responded, "Of course. Anything can happen to anybody. However, I do not think so because she didn't give me a history of other injury. The only history of injury I have is the motor vehicle accident she was involved in."

Next, counsel for Shelby County asked Dr. Dalal if anyone had described to him "the circumstances of the accident." Dr. Dalal stated that he did not recall anything about "the circumstances of the accident." Counsel then attempted to "summarize" it in order to see if it had any effect on his opinions. Counsel stated that Ms. Payne was riding on a bus that was stopped at a red light, with an officer stopped behind her at a complete stop, and when the light turned green, the bus "apparently" did not immediately move forward but the officer did and hit the back of the vehicle. Counsel asked Dr. Dalal if, under those circumstances, a tear of the rotator cuff could occur. He replied unequivocally, "Yes it can." Dr. Dalal explained that he always tells lawyers "sometimes you are lucky" and walk away from a bad accident scratch-free, and sometimes a trivial accident can cause soft tissue injuries. He said it just depends on, at that particular moment, how the person was sitting, what kind of impact occurred, and "in which direction it came and jerked them." Dr. Dalal testified that the rotator cuff is a tendon and is "pretty thin" so "it can easily tear." Counsel then asked Dr. Dalal, "Do you know or have an idea of the mechanism of the actual injury in this accident, do you know how she tore her rotator cuff?" Dr. Dalal said, "No. All I know is she was wearing this lap belt and when she got hit she got jerked in front [is] what she told me." He said he did not know, for example, if when she jerked forward her hand was caught in the back. However, Dr. Dalal concluded by stating that in his experience injuries such as a torn rotator cuff can happen in such relatively minor low speed accidents.

On re-direct, Dr. Dalal acknowledged that Ms. Payne may have also complained to a provider of shoulder pain the day after the accident. He also noted that at her first physical therapy visit on June 30, two weeks after the accident, the therapist was unable to assess the right shoulder's external rotation due to pain, meaning it was very painful when they were rotating her shoulder. According to the record, it was so painful they could not even

turn the arm internally. Dr. Dalal also acknowledged that the history Ms. Payne reported to all of these providers never changed, according to the records from Baptist Minor Medical, Saint Francis Hospital, physical therapy, or his office. Dr. Dalal said he was not aware of any other injury to Ms. Payne that would have caused the shoulder injury. Counsel for Ms. Payne asked Dr. Dalal if Ms. Payne testified in her deposition that when she went forward in her seat at the time of impact her shoulder struck a metal bar on the bus, would that be consistent with the type of injury she had. Dr. Dalal responded affirmatively, stating that a direct hit can also cause a rotator cuff tear. In conclusion, Dr. Dalal reiterated that none of the questions asked during cross-examination had changed any of the opinions he expressed during his direct examination. He said he still felt confident that this wreck was the cause of the injuries he diagnosed. This concluded the testimony from Dr. Dalal's deposition.

The first witness to testify live was Ridley Taylor. Mr. Taylor had been in a relationship with Ms. Payne for ten to twelve years, and they had been living together for the last nine. He testified that prior to the accident at issue in June 2021, he and Ms. Payne enjoyed many outdoor activities such as fishing, working in their flower beds, and walking their two dogs. He described Ms. Payne as healthy and in good physical condition. Mr. Taylor testified that Ms. Payne had never complained of right shoulder pain prior to the accident, and he had never noticed her having any problems with it either. According to Mr. Taylor, Ms. Payne was sore after the accident, mostly in her back, but she also had pain in her right shoulder too. Mr. Taylor said that ever since the accident, Ms. Payne had been unable to cast or reel in order for them to go fishing, she cannot walk their dogs, and she cannot do household chores like washing dishes or gardening. On cross-examination, Mr. Taylor was asked if he recalled any prior accidents involving Ms. Payne, but he did not. Mr. Taylor said this was the only accident she had been in when they were together. Mr. Taylor reiterated that Ms. Payne never complained about pain before the accident and lived an active lifestyle, but since the accident she had become inactive.

Deputy Michael Lange testified next. He was an investigator and accident reconstructionist with the traffic division of the Sheriff's Department. Deputy Lange had responded and investigated the accident involving Deputy Jennings and the shuttle bus. According to Deputy Lange, when he spoke with Deputy Jennings at the scene, Deputy Jennings said that he was stopped behind the bus and watching something suspicious at a nearby gas station, and when the light turned green, he saw other vehicles starting to go, "let his foot off the brake and started to go," but ran into the back of the bus. The investigation summary Deputy Lange prepared stated that the bus began to go forward and then stopped again, and the patrol car was too close to avoid colliding with it. Deputy Lange testified that this characterization of the accident was based on the statements of Deputy Jennings that the bus had started and then stopped suddenly. Deputy Lange acknowledged that the bus was located in the crosswalk beyond the stop line after the accident. In any event, Deputy Lange noted that in a rear end collision, the driver in the front is not responsible. He gave a ticket to Deputy Jennings, citing him for following too

closely.

Based on the extent of the damage to the front of the patrol car, a Dodge Charger, Deputy Lange agreed that this was not a situation in which the car was traveling only two miles an hour. However, the airbag did not deploy in the patrol car. Deputy Lange stated that "[i]f the airbag did not deploy it could be up to eight miles an hour." He also testified that the rear bumper of the bus was damaged. Deputy Lange testified that he knew, while at the scene, that Ms. Payne was complaining of an injury. He had indicated in his report that she was suspected for minor injuries. He also stated that she was concerned about getting the accident report or accident report number.

Deputy Jennings testified next. He explained that he was stopped at an intersection four to five feet behind the bus and watching some suspicious activity at a gas station, when "the vehicles to [his] left began to move forward and [his] brain just assumed that everything was green." Deputy Jennings testified that he "took [his] foot off the brake and began to accelerate," but as he turned around, the vehicle in front him was there and they collided. He later said, if he recalled correctly, his foot was on the accelerator but not pressing down on it. Deputy Jennings testified that he could not recall if the bus moved forward before he hit it or if it remained at a complete stop. He described the impact as "moderate." When asked to rate the impact on a scale of zero to ten, with zero being "no impact" and ten being "like running into a brick wall," he estimated this was a "4 or 5." He was not injured, and his airbag did not deploy, but his vehicle was not operational and had to be towed. Deputy Jennings said he asked the driver of the bus if the passengers were injured, and he thought she said everybody seemed to be okay.

The final witness was Ms. Payne. She was age 60 by the time of trial, although she was 57 at the time of the accident. Ms. Payne had been working for Signature Healthcare of Memphis as a certified nursing assistant for nearly ten years. She testified that her duties included helping residents with activities of daily living such as bathing and eating, and this included transferring patients to and from beds and wheelchairs. Ms. Payne described her physical condition prior to the accident as "great" and "limitless in what I wanted to do," with no issues performing her job. She testified that she had never had any shoulder pain or shoulder injury before this wreck.

Ms. Payne explained that she was seated on the right passenger side, on the very front seat of the bus, on the day of the accident. She testified that the seat had a lap belt, which she had fastened, but not a shoulder belt. Ms. Payne explained that in front of her there was "a vertical metal bar and a metal plate coming across." She said that the bus was stopped at the intersection for a couple of minutes, positioned before the crosswalk, and they did not have any idea that an impact was coming before being hit. She described it as a "hard" impact and said she thought they had been "hit by a truck. It was just that hard." She also noted that the bus was over the crosswalk after the impact.

- 11 -

Ms. Payne said that her body "went forward really hard." She said she informed one of the officers at the scene that she was injured. Ms. Payne testified that she was in pain and in shock. She described the pain as going "[f]rom the right side of my neck all the way down to the middle of my back, the right side." When asked why she declined an ambulance, Ms. Payne said she "didn't want to incur that bill," and she could drive herself to the doctor. Ms. Payne said the reason she asked the deputy about the police report and who was getting the ticket was because she was worried about the fact that one sheriff's deputy was investigating a wreck involving another deputy and feared that something could get misconstrued.

Ms. Payne testified that after the wreck, they took the patient home and went back to Signature Healthcare. However, she clarified that she did not continue working that day because her shift had already ended by that time. When she left work, she went to Baptist Minor Medical, and they sent her to the emergency department at Saint Francis Hospital. Ms. Payne said she was still aching that night and could not do anything physical. She said the next morning she woke up hurting, "[d]own my right side, neck, my shoulder and, you know, down the right side of my body." She returned to Baptist Minor Medical that morning and complained of the pain in her shoulder. Ms. Payne testified that, from that point forward, the pain in her shoulder never went away until she had surgery. She said the pain limited how she could move, and she could not do activities such as fishing or cleaning her house. Ms. Payne said she was sent back to work at light duty, but this meant she was answering call lights, passing ice, assisting patients with eating their meals, and things like that. She said she performed none of the physical components of her job that she had described earlier, such as assisting patients with getting in wheelchairs.

After Ms. Payne's surgery, she was in a sling for six to eight weeks and then had physical therapy for three months. Although she had been discharged from Dr. Dalal's care, she testified that she was still experiencing discomfort and restricted range of motion at the time of trial. She was not able to cast a reel to fish, tend to her flowerbeds, or perform all of her previous duties at work, but she was given accommodations by her employer.

On cross-examination, Ms. Payne acknowledged that she had been involved in three previous car accidents, and all involved injuries to her neck and back. She said she sought medical treatment for those injuries, was represented by counsel, and settled those cases. However, Ms. Payne testified that those accidents involved "fairly quick and full recoveries from those injuries," with no injuries to her shoulders. Ms. Payne explained that after the accident in this case, she chose Baptist Minor Medical for treatment because she was dealing with workers' compensation and had to pick a location on her employer's profile. She said the same was true about Dr. Dalal; he was on the profile and so she "just picked him" for treatment.

This concluded Ms. Payne's proof at trial, and Shelby County did not call any witnesses. During closing arguments, counsel for Ms. Payne suggested that with her

medical expenses of roughly $65,000, lost wages of about $19,000, pain and suffering, and permanent injury, the trial court should award a total sum of damages in the range of $400,000 to $500,000. Counsel for Shelby County asked the trial court to consider the fact that Ms. Payne did not complain of any shoulder injury on the day of the accident; she only mentioned neck and back pain. Counsel acknowledged that Ms. Payne complained the following morning of pain in her right shoulder blade, at Baptist Minor Medical, and again on July 1 during her second visit to the emergency room at Saint Francis, she complained of shoulder pain. However, he emphasized that Ms. Payne consistently complained of pain in her neck and back, and some of the medical records did not mention shoulder pain. Counsel noted that it was not until July 21, one month after the accident, when Ms. Payne first saw Dr. Dalal, and he diagnosed the torn rotator cuff. He stated that "the County is not trying to argue that Ms. Payne was not injured in this accident[.]" But, he added, "on the other hand the County is not a cash register for claimants like Ms. Payne." He asked the court to consider the normal amount of distance between two vehicles at a red light and how fast Officer Jennings could have possibly been going and asked, "Is that $65,000 in medical bills?" Counsel characterized Ms. Payne's claims as "extravagant." He asked the court to carefully consider her "course of medical treatment" and the facts of the accident and make a reasonable award, being "circumspect in its examination of the facts of this case." In rebuttal, counsel for Ms. Payne asked the trial court to look at the amount of damage to the vehicles involved, Ms. Payne's complaint of right shoulder pain the very next morning, the physical therapy record detailing her shoulder pain being so severe that it could not be rotated, and Dr. Dalal's testimony that neck and shoulder pain are often combined.

At the conclusion of the bench trial on March 6, the trial judge took the matter under advisement and informed the parties that she would let them know a date when they could return for her to announce her oral ruling. Nine days later, on March 15, the parties returned for the trial judge's ruling. Judge Hurd began by stating that she "had to really go through the medical records and just make some determinations about causation, I really still had some issues on causation and so just let me tell you what my thinking process was as I came up with what the verdict should be." The trial judge noted that liability was stipulated, so the only issue was the amount of appropriate damages. Briefly recounting the circumstances surrounding the accident, the trial judge noted that Ms. Payne was sitting in the front row of seats in a bus while transporting a patient of her employer when they were rear-ended at a stop light by a Dodge Charger. She noted the sheriff's department report stating that the bus had started moving, while other testimony suggested it had not moved. Referencing a photograph of the patrol car, the trial judge found that it "really absorbed the brunt of the energy and in fact it sustained significantly more damage than the bus." The court found that there were no skid marks at the scene.

Because the transcript of the trial judge's oral ruling was later incorporated into its final order, we quote the remainder of the ruling in full:

- 13 -

The plaintiff reported when she went to her initial hospital visits, which were several and several days in a row and then other days, she reported only neck and lower back pain. There was no mention in her original visit to any shoulder pain.

Then as of July 1st the plaintiff denied that she had any new symptoms and as the Court reviewed the medical records noting the musculoskeletal symptoms there was only reference to neck and back, not shoulder; that was as of July 2nd.

Then the plaintiff's medical records do not show that she reported to the providers anything other than she'd been in a work related accident, that she'd been in a MVA, a motor vehicle accident, but not the nature of her work of what she did. I saw nothing about what she did for a living.

The plaintiff also was ordered not to return to work prior to seeing a specialist, which she did I believe the next day or two and then she did return to work with transitional duty, but all of this was at her regular pay.

The physical therapy report as late as December of 27 (sic) made no reference to shoulder pain. Now, in September Dr. Dalal noted the plaintiff's injury was three months ago and that she was - she had progressively lost motion in her right shoulder. And so it's clear to the Court that that does reference -- well, it's not clear, but it suggests that it does reference the motor vehicle accident because that would have been three – three months ago.

But one thing the Court noticed is that through Dr. Dalal's other records he says it's a work related condition without making reference to the motor vehicle accident except on the very first report. He says it's history of motor vehicle accident and then it says work related condition, but all the other references are work related condition. Work related condition to me is not indicative that she was involved in a motor vehicle accident while at work. It's a work related condition. And I don't know whether doctors do that because of workers' comp or what, but there was no real evidence of that.

In fact, when Dr. Dalal was deposed defense counsel asked well, do you know the mech -- did you know anything about the accident, he didn't know anything about how the accident occurred, he didn't really know the mechanism of her injury exactly, right? I mean there was really nothing that I saw in the records.

So it was September 21st, several months after the accident that the plaintiff did have the rotator cuff surgery. She -- by December she was working full-time with minimal assistance and she was getting her regular pay. The medical records also showed degenerative conditions of the – some bursitis in the right shoulder, but that does not show up for – it's not apparent until several months after the accident. There was no healthcare provided that the Court saw in the record that she had been involved in previous accidents.

The plaintiff testified that her job as a CNA involves her transferring

- 14 -

patients from the bed to wheelchair, helping them dress and to wash themselves so the Court took all of that into consideration.

And so based on all of that the Court finds that the plaintiff really did not prove by preponderance of the evidence that the rotator cuff condition resulted from the automobile accident of July 16, 2021.

The trial court awarded Ms. Payne damages related to her neck and back pain but excluded anything related to the rotator cuff. She announced a total damage award of $75,362.

After discussing who would draft the order, the following exchange occurred between counsel for Ms. Payne and Judge Hurd:

MR. FAIRCHILDS: Correct. But, listen, this is going to have to go up on appeal and so I would appreciate the exhibits, but also I would like on the record something that I had heard. Is it true that your son and Mr. Chockley [counsel for Shelby County] were best friends growing up and that --
THE COURT: And I don't see him at all, but you can include that, and if you want to, if you need a recusal –
MR. FAIRCHILDS: I would just like that to be on the record.
THE COURT: That's fine, yeah.
MR. FAIRCHILDS: Is that true?
THE COURT: It's absolutely true. They were best friends, but I didn't even know Mr. Chockley was a lawyer until I got back on the bench. I mean it's been years. This is when my kid – we moved from that house in 1991. I didn't know what Mr. Chockley was -- was doing. I still have his mother's recipe, this is no doubt, but, you know, I, and, Mr. Fairchilds, honest to goodness I understand, you do what you need to do. You can file a motion for recusal if you like. Go ahead.
MR. FAIRCHILDS: Well, based on that do[es] Your Honor think you should have recused yourself --
THE COURT: No.
MR. FAIRCHILDS: -- prior to this trial starting?
THE COURT: Absolutely not.
MR. FAIRCHILDS: There was absol -- okay. Thank you, Your Honor.
THE COURT: Very good.
MR. FAIRCHILDS: Have a great weekend.

Three weeks after the oral ruling was announced on March 15, the trial court entered its written order on April 5. The written order largely restated the trial court's oral ruling and also incorporated it by reference. Relevant to this appeal, the trial court found that Ms. Payne failed to prove by a preponderance of the evidence that her torn rotator cuff resulted from the accident on June 16, for the reasons set forth in the transcript above.

- 15 -

Nearly two weeks later, Ms. Payne filed a motion to recuse or disqualify Judge Hurd and to set aside the judgment, citing Tennessee Supreme Court Rule 10B and Tennessee Rules of Civil Procedure 59 and 60. The motion asserted that, "[u]nbeknownst to [Ms. Payne], Mr. Chockley has a personal relationship with Judge Hurd and her son." The motion stated that Judge Hurd's son and Mr. Chockley "were best friends growing up" and likely had play dates, meals together, and sleepovers. Ms. Payne alleged that the relationship was not disclosed prior to the date of trial and that she had no opportunity to investigate it or draft a motion for recusal prior to commencement of the trial. Thus, Ms. Payne asked Judge Hurd to recuse herself and set aside the order in order to avoid an appearance of impropriety.

Shelby County filed a response, asking the trial court to deny the motion. First, Shelby County argued that the recusal motion was untimely given that comments were made alerting Ms. Payne of the personal relationship before trial. Shelby County noted that on the first day of trial, before the proceedings began, Judge Hurd told Ms. Payne's counsel about a cake recipe she still had from Mr. Chockley's family. According to Shelby County, the transcript did not reveal the entire conversation, but Judge Hurd also informed counsel for Ms. Payne at that time that her son and Mr. Chockley were friends as children for several years in the 1980s. Shelby County noted that counsel for Ms. Payne did nothing in response to raise any issue about impartiality. Instead, they tried the case to its conclusion, and Judge Hurd announced that she would render an oral ruling at a later date. Shelby County noted that counsel for Ms. Payne had another opportunity to seek recusal when the parties appeared before Judge Hurd for her to announce her oral ruling nine days later. However, Ms. Payne waited until after Judge Hurd announced her decision to question Judge Hurd about the allegedly improper relationship. Ms. Payne then waited a month to file her motion for recusal, after the trial court had entered its written order. Thus, Shelby County asserted that Ms. Payne did not act promptly in seeking recusal and instead engaged in "strategic conduct to gain a procedural advantage by waiting to see if the Court would award the amount of the judgment Plaintiff sought before seeking recusal as a back-up plan." Accordingly, Shelby County asked the trial court to deny the recusal motion on that basis.

Alternatively, Shelby County argued that Judge Hurd's impartiality could not reasonably be questioned based on events that occurred four decades earlier. Shelby County attached a declaration from Mr. Chockley, who stated that he became friends with Judge Hurd's son when they were in the third grade in 1980, and they had playdates at each other's houses and occasional sleepovers. However, Mr. Chockley stated that, when they were in ninth grade, they drifted apart and no longer socialized outside of school regularly. Mr. Chockley stated that he had only seen Judge Hurd's son on a few occasions since high school, and the last time they socialized or intentionally spent time together was over thirty years earlier when they were minors. Mr. Chockley stated that he had fond memories of Judge Hurd from his childhood, but no personal relationship had existed between them since his childhood. He stated that his only encounters with Judge Hurd since she became

a trial judge in 2010 had been inside the courtroom. Thus, Shelby County argued that a childhood friendship between Judge Hurd's son and Mr. Chockley forty years ago was not a sufficient basis for recusal, and this provided an alternative basis for denying the recusal motion.

At a hearing on the recusal motion, counsel for Ms. Payne began by conceding that "right before our trial started you [Judge Hurd] had mentioned that Mr. Chockley and your son were friends when they were children and you mentioned something about a chocolate cake recipe[.]" However, counsel suggested that "[t]he trial started 10 seconds later," and he learned "seven or eight days later," when the matter was discussed following Judge Hurd's oral ruling, that they were best friends. Judge Hurd stated that she typically mentions the childhood friendship between Mr. Chockley and her son anytime Mr. Chockley is on a case before her "just in case someone wants to ask about the relationship." Counsel for Ms. Payne then suggested that it put him in a difficult position when he was informed of the relationship "literally 10 seconds before the trial started" because he was "caught off guard," did not know all of the facts, and left in an extremely difficult position with no time to file a recusal motion before the trial began. He denied engaging in any "gamesmanship" and suggested that he was the one who was "ambushed 10 seconds before the trial started." Judge Hurd reiterated that "[i]t's been like 40 years" since the relationship existed. She stated that she is a native Memphian and simply cannot recuse herself from every matter involving someone who was once a friend of her children. Judge Hurd noted that she informed counsel for Ms. Payne of the childhood friendship prior to trial in order to give him an opportunity to ask questions about it, and he could have sought a continuance at that time. She said that the issue was raised in front of counsel and his client, and they could have asked for time to discuss the matter. However, Judge Hurd also pointed out that after the trial court concluded, she took the matter under advisement for over a week before announcing her oral ruling. She noted that no issue regarding recusal was raised in the interim eight or nine days, even after the parties were notified that she had come to a decision. Judge Hurd stated that everyone appeared for the oral ruling, no one mentioned recusal at the outset, "and then I read my ruling and the minute I finished you raised recusal; not anytime before that. That's what I see as a problem. . . . I give you the dollar figure, immediately recusal. That to me is the problem." Thus, Judge Hurd denied the motion to recuse and to set aside, and she entered a written order to that effect. The order clarified that Ms. Payne sought recusal because counsel for Shelby County was a childhood friend of the judge's son, but, "except perhaps for an incidental encounter, [Shelby County's] counsel and the judge's son have not seen each other in over 40 years." Thus, Judge Hurd found that a reasonable person in the judge's position, knowing all the facts, would not question the judge's impartiality in this case. The order further stated that Judge Hurd had no actual bias or prejudice for or against either party.

"In addition," the court found that Ms. Payne's motion was "untimely and appears to be presented for an improper purpose." Judge Hurd found that Ms. Payne was aware of the relationship prior to trial but "failed to seek recusal until after the court rendered its

verdict awarding Plaintiff $75,362.00 instead of the amount requested during Plaintiff's closing." Thus, Ms. Payne's counsel "did not mention recusal until seconds after the judge rendered the verdict – nine days after disclosure of the relationship." Under those circumstances, Judge Hurd found that Ms. Payne's delay in seeking recusal rendered the motion untimely and suggested it was presented for the improper purpose of having a chance to relitigate the issues she had already decided. The trial court found no basis for relief under Rule 10B or Rules 59.04 or 60.02. Ms. Payne timely filed a notice of appeal.

## II. ISSUES PRESENTED

Ms. Payne presents the following issues for review on appeal:

1.  Whether the trial court erred in finding that Ms. Payne's right shoulder injury was not related to the subject wreck when virtually all of the evidence introduced at trial preponderated in favor of causation, including undisputed expert medical testimony, the medical records and lay witness testimony.
2.  Whether the trial court erred in denying Ms. Payne's Motion to Recuse and to Set Aside Order of Judgment when there was a significant pre-existing relationship between the Trial Court and counsel for Appellee that was not timely, nor adequately, disclosed and would have provided reasonable grounds to question the impartiality of the Trial Court.

For the following reasons, we affirm the decision of the trial court denying the motion to recuse or set aside, we reverse its decision as to causation, and we remand for further proceedings consistent with this opinion.[3]

## III. DISCUSSION

### A. Recusal

Tennessee Supreme Court Rule 10B provides, in pertinent part:

> Any party seeking disqualification, recusal, or a determination of constitutional or statutory incompetence of a judge of a court of record . . . shall do so by a written motion filed promptly after a party learns or reasonably should have learned of the facts establishing the basis for recusal.

Tenn. Sup. Ct. R. 10B, § 1.01. This Court reviews a trial court's decision on a motion for

---

[3] We remind counsel for Ms. Payne that "[a]ppellate litigants have an obligation to file briefs that comply with all applicable rules, including the rules requiring record citations in both the statement of facts *and argument sections* of the brief." *DiNovo v. Binkley*, 706 S.W.3d 334, 336 (Tenn. 2025) (citing Tenn. R. App. P. 27(a)(6), (7); Tenn. Ct. App. R. 6(a)(4), (b)) (emphasis added).

recusal under a de novo standard of review. Tenn. Sup. Ct. R. 10B § 2.01.

The Tennessee Supreme Court recently summarized the following standards that guide courts regarding recusal motions:

> "Tennessee litigants are entitled to have cases resolved by fair and impartial judges." *Cook v. State*, 606 S.W.3d 247, 253 (Tenn. 2020) (citing *Davis* [*v. Liberty Mut. Ins. Co.*, 38 S.W.3d 560, 564 (Tenn. 2001)]); *see also State v. Griffin*, 610 S.W.3d 752, 757-58 (Tenn. 2020). To preserve public confidence in judicial neutrality, judges must be fair and impartial, both in fact and in perception. *Cook*, 606 S.W.3d at 253; *Kinard v. Kinard*, 986 S.W.2d 220, 228 (Tenn. Ct. App. 1998). To these ends, the Tennessee Rules of Judicial Conduct ("RJC") declare that judges must "act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety." Tenn. Sup. Ct. R. 10, RJC 1.2. Another provision declares that judges "shall uphold and apply the law, and shall perform all duties of judicial office fairly and impartially." *Id.*, RJC 2.2.
>
> To act "impartially" is to act in "absence of bias or prejudice in favor of, or against, particular parties or classes of parties, as well as maintenance of an open mind in considering issues that may come before a judge." *Id.*, Terminology. "A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned." *Id.*, RJC 2.11(A).
>
> Rule of Judicial Conduct 2.11 "incorporates the objective standard Tennessee judges have long used to evaluate recusal motions." *Cook*, 606 S.W.3d at 255. "Under this objective test, recusal is required if 'a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality.'" *Id*. (quoting *Davis*, 38 S.W.3d at 564-65).
>
> The intermediate appellate courts have explained that the proponent of a recusal motion bears the burden of establishing that recusal is appropriate and that any alleged acts of bias or prejudice arise from extrajudicial sources rather than from events or observations during the litigation of the case. *Tarver v. Tarver*, No. W2022-00343-COA-T10B-CV, 2022 WL 1115016, at *2 (Tenn. Ct. App. Apr. 14, 2022). A trial judge has a duty to serve unless the proponent establishes a factual basis warranting recusal. *Raccoon Mtn. Caverns and Campground, LLC v. Nelson*, No. E2022-00989-COA-T10B-CV, 2022 WL 3100606, at *3 (Tenn. Ct. App. Aug. 4, 2022) (quoting *Rose v. Cookeville Reg'l Med. Ctr.*, No. M2007-02368-COA-R3-CV, 2008 WL 2078056, at *2 (Tenn. Ct. App. May 14, 2008)).

*Adams v. Dunavant*, 674 S.W.3d 871, 878-79 (Tenn. 2023).

### 1. Timeliness

As previously noted, Rule 10B requires the filing of "a written motion filed promptly after a party learns or reasonably should have learned of the facts establishing the basis for recusal." Tenn. Sup. Ct. R. 10B, § 1.01. "Promptness is mandatory and its importance is declared at the very beginning of the rule." *Harris v. Allen*, No. W2023-01794-COA-T10B-CV, 2024 WL 137453, at *2 (Tenn. Ct. App. Jan. 11, 2024). The Explanatory Comment to Rule 10B provides:

> Although the rule does not state a specific period of time within which the motion must be filed, a motion under this rule should be made promptly upon the moving party becoming aware of the alleged ground or grounds for such a motion. The requirement that the motion be timely filed is therefore intended to prevent a party with knowledge of facts supporting a recusal motion from delaying filing the motion to the prejudice of the other parties and the case. Depending on the circumstances, delay in bringing such a motion may constitute a waiver of the right to object to a judge presiding over a matter. Further, the delay in bringing a motion or the timing of its filing may also suggest an improper purpose for the motion.

Tenn. Sup. Ct. R. 10B, Cmt, § 1.

Regarding timeliness, our Supreme Court has also explained,

> If a litigant knows of facts indicating that a judge cannot fulfill the judicial obligations of fairness and impartiality, the litigant should request the judge's recusal by filing a written motion. See Tenn. Sup. Ct. R. 10B, § 1.01. Recusal motions should be filed when "the facts forming the basis of that motion become known." Bean v. Bailey, 280 S.W.3d 798, 803 (Tenn. 2009) (citing Davis v. Tenn. Dep't of Emp't Sec., 23 S.W.3d 304, 313 (Tenn. Ct. App. 1999)). A litigant cannot manipulate the judicial process by knowing of allegedly improper judicial conduct but remaining silent until after the legal matter has been resolved unfavorably to the litigant. Id. (quoting Tenn. Dep't of Emp't Sec., 23 S.W.3d at 313). Therefore, a claim of judicial bias may be deemed waived if a litigant either fails to file a written recusal motion or fails to file a written recusal motion in a timely manner after learning the facts that form the basis of the request. Id. (citing Tenn. Dep't of Emp't Sec., 23 S.W.3d at 313).

*Cook*, 606 S.W.3d at 254. "The frequently cited rule that 'a party must complain and seek relief immediately after the occurrence of a prejudicial event and may not silently preserve

- 20 -

the event as an 'ace in the hole' to be used in the event of an adverse decision,' applies in cases where a party challenges a judge's impartiality.'" *Eldridge v. Eldridge*, 137 S.W.3d 1, 8 (Tenn. Ct. App. 2002) (quoting *Gotwald v. Gotwald*, 768 S.W.2d 689, 694 (Tenn. Ct. App. 1988)).

Here, Ms. Payne and her counsel were made aware of the childhood friendship between Judge Hurd's son and counsel for Shelby County before the trial began. Ms. Payne concedes in her brief that Judge Hurd stated, before trial, that "Mr. Chockley and her son were friends as children and that Mr. Chockley's mother had previously shared a chocolate chip cake recipe with her." However, Ms. Payne did not express any objection to that fact when it was disclosed, during the remainder of the trial that day, in the week that followed while the matter was under advisement, or when they appeared in court to hear Judge Hurd's oral ruling. However, once Judge Hurd announced her decision, counsel for Ms. Payne immediately asked, "Is it true that your son and Mr. Chockley were best friends growing up[?]" After this discussion of the matter on March 15, Ms. Payne then waited another month before filing a written recusal motion on April 18. This timing compels the conclusion that Ms. Payne "purposely decided to use the impartiality issue as [her] 'ace-in-the-hole' in the event that [she] lost the [trial] on the merits," or at least was unhappy with the amount of damages awarded. *Eldridge*, 137 S.W.3d at 8 (quoting *Davis*, 23 S.W.3d at 313). "[C]ourts frown upon the manipulation of the impartiality issue to gain procedural advantage and will not permit litigants to refrain from asserting known grounds for disqualification in order to experiment with the court . . . and raise the objection later when the result of the trial is unfavorable." *Id.* (quoting *Kinard*, 986 S.W.2d at 228). "One cannot know of [allegedly] improper judicial conduct, gamble on a favorable result by remaining silent as to that conduct, and then complain that he or she guessed wrong and does not like the outcome." *Huntley v. Huntley*, 61 S.W.3d 329, 340 (Tenn. Ct. App. 2001) (quoting *Tenn. Dep't of Emp't Sec.*, 23 S.W.3d at 313); *see, e.g.*, *James v. James*, 344 S.W.3d 915, 918 (Tenn. Ct. App. 2010) ("In this case, notwithstanding the trial court's insertion of comments and remarks during the hearing of this matter, Ms. James' failure to request recusal of the trial court until after the court rendered its judgment operates as a waiver."). Therefore, we agree with the trial court's conclusion that Ms. Payne's recusal motion was untimely, and she has waived her argument regarding recusal. *See Eldridge*, 137 S.W.3d at 8.

## 2.  Appearance of Impropriety

Even though we conclude that Ms. Payne failed to timely move for recusal, we further note that the alleged basis for recusal in this case was meritless. In *State v. Cannon*, 254 S.W.3d 287, 307 (Tenn. 2008), the Tennessee Supreme Court considered a case in which a defendant argued that "a friendship between the trial judge and ADA Moore, one of the Assistant District Attorneys General prosecuting the case, created a serious appearance of impropriety that warranted the recusal of the trial judge." The defendant argued that "their participation in a group overseas vacation, frequent visits to the trial

- 21 -

judge's home by ADA Moore, and ADA Moore's admission that she and the trial judge are 'close friends,' mandates recusal[.]" *Id.* However, our Supreme Court explained,

> The mere existence of a friendship between a judge and an attorney is not sufficient, standing alone, to mandate recusal.
> In *United States v. Murphy*, 768 F.2d 1518, 1537 (7th Cir. 1985), the Court of Appeals for the Seventh Circuit stated:
>
>> In today's legal culture friendships among judges and lawyers are common. They are more than common; they are desirable. A judge need not cut himself off from the rest of the legal community. Social as well as official communications among judges and lawyers may improve the quality of legal decisions. Social interactions also make service to the bench, quite isolated as a rule, more tolerable to judges. Many well-qualified people would hesitate to become judges if they knew that wearing the robe meant either discharging one's friends or risking disqualification in substantial numbers of cases.
>
> *See also In re Hutter*, 221 B.R. 632, 640 (Bankr. D. Conn. 1998) (noting that "[a] judge is neither required nor encouraged to forego social interaction and involvement upon assuming his or her office"); *Hadler v. Union Bank & Trust Co.*, 765 F. Supp. 976, 977 (S.D. Ind. 1991) (reasoning that the judicial oath of office "would provide little solace to the thousands of litigants who daily seek redress of their legal claims in federal court were it supposed that judges would regularly be unable to set aside personal friendships in order to uphold the law"). The Code of Judicial Conduct does not require judges to remain isolated from other members of the bar and from the community.

*Id.* at 308.

This Court has reached the same conclusion in other cases involving friendships. *See, e.g.*, *In re Conservatorship of Milem*, No. W2023-01743-COA-T10B-CV, 2024 WL 326863, at *6 (Tenn. Ct. App. Jan. 29, 2024) ("Son alleges a 'lengthy friendship' between the Trial Judge and one of ElderCare's attorneys . . . . Son provides no supporting information describing the alleged friendship or the extent of such friendship other than it began in 2001 or 2002 when Ms. Baker was a clerk for the prior judge. This Court has held that the Code of Judicial Conduct does not require judges to remain isolated from other members of the bar and from the community. Son has not demonstrated a friendship between the Trial Judge and Ms. Baker that would cause the judge's impartiality to reasonably be questioned.") (quotation omitted); *Allen v. Allen*, No. E2023-01660-COA-T10B-CV, 2023 WL 8598662, at *5-6 (Tenn. Ct. App. Dec. 12, 2023) ("[T]he theatrical play Mother and Judge Cook both participated in had occurred in 2016, nearly seven years

- 22 -

before the motions to recuse filed by Father. According to Judge Cook, the relationship was limited in time and scope. Although Mother had spoken to Judge Cook informally regarding representing her in the divorce proceedings, the Trial Judge stated that she declined such representation without a consultation. . . . Father has failed to present evidence demonstrating Judge Cook and Mother had a close relationship or that such relationship had continued following the play in which they performed together in 2016."); *Ryan v. Soucie*, No. E2018-01121-COA-R3-CV, 2019 WL 3238642, at \*10-11 (Tenn. Ct. App. July 18, 2019) (finding no basis for recusal where the chancellor and plaintiffs' counsel were former partners 23 years ago, as "[a]pplicable law does not mandate a judge's recusal from a case simply because that judge is acquainted with or was once professionally associated with a party's counsel"); *In re Conservatorship of Patton*, No. M2012-01878-COA-10B-CV, 2012 WL 4086151, at \*3 (Tenn. Ct. App. Sept. 17, 2012) ("a judge is not required to recuse himself or herself from every case in which counsel of record is a former law clerk or is viewed as a mentor or friend by the law clerk"); *Kinard*, 986 S.W.2d at 228-29 ("The fact that a judge was once professionally associated with a lawyer for one of the parties in a case is not, without more, grounds for disqualification. . . . A judge is likewise not disqualified solely because he or she may at one time have had an office sharing arrangement with a lawyer for one of the parties.").

Keeping these principles in mind, we conclude that the childhood friendship between Judge Hurd's son and counsel for Shelby County over thirty years ago does not warrant recusal in this case. A person of ordinary prudence in the judge's position, knowing all the facts known to the judge, would not find a reasonable basis for questioning the judge's impartiality. *See Cook*, 606 S.W.3d at 255. We affirm the denial of the motion for recusal.

### B. Causation of the Shoulder Injury

We now turn to Ms. Payne's second issue, which she frames as "[w]hether the Trial Court erred in finding that Plaintiff's right shoulder injury was not related to the subject wreck when virtually all of the evidence introduced at trial preponderated in favor of causation, including undisputed expert medical testimony, the medical records and lay witness testimony." As previously discussed, the trial court gave several specific reasons to explain why it found that Ms. Payne failed to prove causation. As such, we will review each of those stated reasons in turn.

We note that issues as to causation of an injury are questions of fact. *Hall v. Am. Freight Sys., Inc.*, 687 S.W.2d 713, 713 (Tenn. 1985). In an appeal from a bench trial, we review the trial court's findings of fact de novo with a presumption of correctness. Tenn. R. App. P. 13(d); *In re Angela E.*, 303 S.W.3d 240, 246 (Tenn. 2010). Questions of law are reviewed de novo but with no presumption of correctness. *Eberbach v. Eberbach*, 535 S.W.3d 467, 473 (Tenn. 2017) (citing *Barnes v. Barnes*, 193 S.W.3d 495, 498 (Tenn. 2006); *Taylor v. Fezell*, 158 S.W.3d 352, 357 (2005)). "Because the trial court is able to

observe witnesses as they testify, appellate courts afford deference to the trial court's credibility assessments of live, in-court testimony." *Trentham v. Mid-Am. Apartments, LP*, 705 S.W.3d 151, 161-62 (Tenn. 2025) (quoting *Phillips v. Hatfield*, 624 S.W.3d 464, 474 (Tenn. 2021)). "By contrast, 'when evaluating documentary proof, the ability of an appellate court to assess the evidence is the same as that of the trial court, and thus there need be no deference afforded to the trial court's assessment.'" *Id.* at 162 n.12 (quoting *Phillips*, 624 S.W.3d at 474). For instance, where, as here, "the issues involve expert medical testimony that is contained in the record by deposition, determination of the weight and credibility of the evidence necessarily must be drawn from the contents of the depositions, and the reviewing court may draw its own conclusions with regard to those issues." *Foreman v. Automatic Sys., Inc.*, 272 S.W.3d 560, 571 (Tenn. 2008) (citing *Orrick v. Bestway Trucking, Inc.*, 184 S.W.3d 211, 216 (Tenn. 2006)). "Causation in a personal injury action must ordinarily 'be established by testimony from a medical expert.'" *Bell v. Roberts*, No. M2018-02126-COA-R3-CV, 2020 WL 3832995, at *3 (Tenn. Ct. App. July 8, 2020) (quoting *Miller v. Choo Choo Partners, L.P.*, 73 S.W.3d 897, 901 (Tenn. Ct. App. 2001)).

Initially, we note that in the trial court's description of the circumstances surrounding the accident, it found that there was some conflicting evidence regarding whether the bus had started moving prior to the collision. In any event, the court found that photographs showed that "the Dodge Charger absorbed the brunt of the energy in the wreck and sustained significantly more damage than the bus." We agree that the police cruiser sustained significantly more damage, as it was not operational and had to be towed from the scene.

After stating its finding that "[Ms. Payne's] right shoulder injury was not caused by the wreck," the first reason the trial court gave for its conclusion related to Ms. Payne's complaints of pain following the accident. The order states,

> The Court finds that Plaintiff sustained injuries to her neck and back as a result of the wreck, however the Court finds that the right shoulder injury was not caused by the wreck. The Court finds that the Plaintiff reported only neck and lower back pain at her initial hospital visits, which were several in number and several days in a row and then also on other days. The Court finds that as of July 1, 2021, Plaintiff denied any new symptoms and there was only reference in the medical records to neck and back pain. The Court finds that as of July 2, 2021, there was only reference of neck and back pain, not shoulder pain, in the medical records. The Court finds that the physical therapy reports made no reference to shoulder pain.

Ms. Payne argues that these findings are factually incorrect, and we agree.

Initially, we note that Ms. Payne did not visit the hospital "several days in a row."

- 24 -

Instead, she visited Saint Francis Hospital twice, once on the evening of June 16 after the accident, when she was referred there by Baptist Minor Medical, and again on July 1, after being sent there by Baptist Minor Medical due to continued neck pain. Ms. Payne did not visit Baptist Minor Medical "several days in a row" either. She went there on the day of the accident, the following morning as she was instructed to return for a follow-up visit, for two weekly follow-up visits thereafter, and an additional follow-up visit after her second emergency room referral, as she was instructed.

More importantly, however, we conclude that the trial court erred in finding that Ms. Payne reported "only neck and lower back pain" at her initial visits. The morning after the accident, at Baptist Minor Medical, Ms. Payne reported, according to her medical records, "her pain is 8/10 from her neck to low back *and right shoulder blade*." (emphasis added). The record from her next visit, one week later, stated she reported "her pain is unchanged." When she started physical therapy the following week, on June 30, she reported "her aching pain is mainly on the R," according to the therapist's records. He indicated that when evaluating her shoulder internal rotation, he was "[u]nable to assess on R due to pain." According to Dr. Dalal, this meant that it was very painful when the therapist was rotating the shoulder, and so painful that they could not even turn the arm internally. Then, at Ms. Payne's second emergency room visit, on July 1, she reported painful range of motion in her neck with pain that went into both superior shoulders.

Thus, the trial court's factual finding that Ms. Payne only reported neck and back pain at her "initial" visits is not supported by the preponderance of the evidence. We further conclude that the evidence preponderates against the trial court's additional findings that "as of July 1, 2021, . . . there was only reference in the medical records to neck and back pain," and "as of July 2, 2021, there was only reference of neck and back pain, not shoulder pain, in the medical records." There were several express references to shoulder pain in the medical records prior to and on July 1, 2021. Lastly, the trial court found that "the physical therapy reports made no reference to shoulder pain." Again, however, the physical therapist report specifically states, with respect to the shoulders, that he was "[u]nable to assess on R due to pain." The evidence recited above, directly from Ms. Payne's medical records, simply does not support the trial court's factual findings with respect to the nature of Ms. Payne's complaints after the accident. Moreover, we note Dr. Dalal's testimony that it is sometimes difficult, even for an orthopedic surgeon, to determine if pain is coming from the neck or from the shoulder because the pain can overlap. He said, "It's hard to figure it out."

The next reason the trial court gave for its decision concerned the medical records of Dr. Dalal. The trial court's order states:

The Court finds that in September of 2021, Dr. Apurva Dalal noted in his medical records that Plaintiff's injury was three (3) months prior and that she progressively lost motion in her right shoulder. The Court finds that it is

- 25 -

not clear that Dr. Dalal was referring to the motor vehicle accident that occurred three (3) months prior. The Court finds that the medical record from Plaintiff's first visit with Dr. Dalal references a motor vehicle collision three (3) months prior; however all of the subsequent medical records from Dr. Dalal's office reference a work related condition without mention of a motor vehicle collision. The Court finds that the term "work related condition" is not indicative that Plaintiff was involved in a motor vehicle collision while at work.

From this paragraph, we can only surmise that the trial court believed Dr. Dalal's references in the medical records to a "work related condition" suggested some type of injury had occurred unrelated to the motor vehicle accident. However, a review of *all* the evidence simply does not support such a conclusion.

As the trial court acknowledged, the medical record from Ms. Payne's first appointment with Dr. Dalal specifically referenced the motor vehicle accident. It stated:

Patient is a very pleasant 57-year-old African-American female who comes today with complaints of severe pain in her neck, right shoulder and mid to low back. *She tells me all of this pain began after a work-related event on June 16, 2021. She states that she works for a nursing facility and while transporting a patient she was sitting in one of the front rows of the bus when the bus was rear-ended by the sheriff's department car. She tells me that they only have lap seatbelts and she went forward upon collision.* Following the accident she was sent to Baptist Minor medical by Workmen's Comp. and was referred to start physical therapy. She was told that she was then referred to our office and was told to stop any therapy. *She denies any pain prior to this event.* She tells me now she has constant pain in her entire back. She is unable to lift her right arm. She cannot sleep on her right side.

(emphasis added). This passage makes clear that the "work related event" in question was the June 16 car crash. Dr. Dalal's "Assessments" from that visit included the following:

1. Complete tear of right rotator cuff - M75.121 (Primary)
. . .
8. History of motor vehicle accident - Z87.828
9. Work-related condition - Z56.89

The record from Ms. Payne's September appointment, which the trial court also referenced, stated, "Patient returns today after MRI of the right shoulder. Her injury was 3 months ago/. and she has progressively lost motion in the right shoulder." This is entirely consistent with the first record, as it indicates that the injury occurred three months prior to September, meaning in June. We find no support for the trial court's finding that "it is

- 26 -

not clear that Dr. Dalal was referring to the motor vehicle accident that occurred three (3) months prior." That is clearly the event to which he refers. We acknowledge that there are references in the records to this being a "work-related condition." However, an examination of the records in their entirety reveals that the work-related condition being referenced was the injury during the June 16 accident.

In addition, Dr. Dalal testified unequivocally, "The only history of injury I have is the motor vehicle accident she was involved in." He testified,

> Q. Doctor, are those injuries consistent with Ms. Payne being involved in this motor vehicle collision on June 16th, 2021?
> A. Yes, sir.
> Q. Do you have an opinion whether those injuries were caused by the motor vehicle collision?
> A. With a reasonable degree of medical certainty I can state that her injuries were caused by motor vehicle accident.

He also testified that "[h]er cervical strain, lumbar strain and tear of the rotator cuff on the right shoulder occurred due to the automobile collision." Dr. Dalal acknowledged that it was "possible" that Ms. Payne could have suffered some other injury to her shoulder between the date of the accident on June 16 and the date he first saw her on July 21, as he stated that "[a]nything can happen to anybody," but he did not think that was the case with Ms. Payne because she did not give him any history of any other injury. He testified that he was not aware of any other injuries to Ms. Payne that would have caused this injury and was confident it was caused by the wreck. He noted that she had reported shoulder pain to other medical providers after the accident. Considering all of this evidence, we conclude that the proof does not support the trial court's apparent conclusion that Dr. Dalal found some other "work related condition" that was not in reference to the auto accident at issue.

The next reason the trial court gave in support of its decision regarding causation was that "Plaintiff had degenerative conditions in the right shoulder, including some bursitis of the right shoulder, that was not apparent until several months after the subject wreck." It is not clear from this statement exactly what conclusion the trial court reached as to the presence of bursitis. It appears that the term "bursitis" was only mentioned once at trial, when Dr. Dalal was asked about his diagnoses from the first appointment, one month after the accident, and he stated "clinically I recorded that I felt there was a tear of the rotator cuff right shoulder, the subacromial bursitis right shoulder, impingement syndrome, cervical radiculopathy, lumbar sprain and cervical sprain." Bursitis was also mentioned a few times in the medical records.[4] However, there is simply nothing in the

---

[4] For instance, Dr. Dalal's operative report from surgery stated, "Examination of the subacromial space showed severe adhesions of the rotator cuff with the surrounding tissue with severe subacromial bursitis." The MRI results also stated, "Note is made of mild fluid within the subacromial/subdeltoid bursa.

record to suggest that the presence of bursitis somehow meant that Ms. Payne's torn rotator cuff was not caused by the June 16 auto accident. There was certainly no testimony from Dr. Dalal to that effect, as he testified that Ms. Payne's "tear of the rotator cuff on the right shoulder occurred due to the automobile collision." As noted by Ms. Payne in her brief on appeal, there was simply no testimony regarding how bursitis would be relevant to causation of the rotator cuff tear.

The next reason the trial court gave for its decision was that "Dr. Dalal did not know anything about how the wreck occurred. The Court further finds that Dr. Dalal did not know the exact mechanism of the right shoulder injury." This finding is at odds with the fact that Dr. Dalal's medical record from the first visit stated, "She states that she works for a nursing facility and while transporting a patient she was sitting in one of the front rows of the bus when the bus was rear-ended by the sheriff's department car. She tells me that they only have lap seatbelts and she went forward upon collision." Dr. Dalal also recited this information at the beginning of his deposition. When asked later during his deposition if he knew "the mechanism of the actual injury" in Ms. Payne's accident, Dr. Dalal responded, "No. All I know is she was wearing this lap belt and when she got hit she got jerked in front [is] what she told me." Counsel for Shelby County attempted to "summarize" the facts for Dr. Dalal, stating that both vehicles were at a complete stop and the sheriff's officer went forward from a stop and hit the vehicle she was in. He asked if, in Dr. Dalal's opinion, a rotator cuff tear can occur under such circumstances, and Dr. Dalal said yes. He explained that the tendon is "pretty thin" and "can easily tear," even in "relatively minor low speed accidents." Thus, the record does not support the trial court's finding that "Dr. Dalal did not know anything about how the wreck occurred." And, although Dr. Dalal may not have identified the precise "mechanism" of the injury, he knew that Ms. Payne was wearing a lap belt and "got jerked" forward, he testified that such an accident can cause a torn rotator cuff because it is "pretty thin" and "can easily tear," and he opined that this accident did in fact cause Ms. Payne's injury.

Finally, the trial court found:

> Then the plaintiff's medical records do not show that she reported to the providers anything other than she'd been in a work related accident, that she'd been in a MVA, a motor vehicle accident, but not the nature of her work of what she did. I saw nothing about what she did for a living.

---

These findings are compatible with bursitis." The report concluded by stating,

IMPRESSION:
1. Partial thickness bursal sided insertional tearing of the supraspinatous tendon is noted.
2. No additional discrete rotator cuff tendon tear is seen. Relatively mild appearing infraspinatus and subscapularis tendinosis are present.
3. Proximal biceps tendinosis was noted.
4. Mild appearing subacromial/subdeltoid bursitis.

- 28 -

The plaintiff also was ordered not to return to work prior to seeing a specialist, which she did I believe the next day or two and then she did return to work with transitional duty, but all of this was at her regular pay.

. . . .

The plaintiff testified that her job as a CNA involves her transferring patients from the bed to wheelchair, helping them dress and to wash themselves so the Court took all of that into consideration.

And so based on all of that the Court finds that the plaintiff really did not prove by preponderance of the evidence that the rotator cuff condition resulted from the automobile accident of July [sic] 16th, 2021.

First of all, the record does not support a finding that Ms. Payne's medical records did not show that she reported to providers "what she did for a living" or "the nature of her work." Dr. Dalal's medical record from the first appointment states that Ms. Payne informed him that she "works for a nursing facility" and was transporting a patient on the day of the accident. Also during Dr. Dalal's deposition, he was asked about the fact that Ms. Payne was "off work from her job as a CNA" from July 22, the day after their first appointment, through January 13, when she was released, and Dr. Dalal testified that "it was reasonably necessary for her to be off work" during that time, and in fact, he was the one who "took her off work during that period of time."

As for the trial court's next finding regarding Ms. Payne being "ordered not to return to work prior to seeing a specialist," it appears that the trial court was referencing a box that was checked on a "CompTrac Work Status Report" from the day of the accident when Ms. Payne first visited Baptist Minor Medical. On appeal, Shelby County references this document and argues that "[d]espite these instructions, [Ms. Payne] did return to work, and continued to work light duty for her normal shift hours." According to Shelby County, "[t]he Trial Court noted that [Ms. Payne] was ordered not to return to work prior to seeing a specialist, which she did anyway, at regular pay." However, from our review of the document, the "Return to Work" section had a box checked to indicate "MAY NOT return to work prior to seeing specialist (see above)." The "Referral Information" section immediately above this section referred Ms. Payne to the "ER." Ms. Payne did visit the ER that same evening. The "CompTrac Work Status Report" from her visit the following morning stated under the "Return to Work" section that she was permitted to return to work at transitional duty, with her specific restrictions noted. Thus, it does not appear that Ms. Payne violated these instructions.

Ultimately, from this finding regarding the nature of Ms. Payne's job responsibilities, it appears that the trial court concluded that Ms. Payne's rotator cuff injury must have occurred somehow, sometime, during the course of performing physical duties of her job, rather than during the accident. However, Shelby County presented no proof to that effect. It did not call any witnesses. Although the trial court noted that Ms. Payne had returned to work at "transitional" duty, Ms. Payne testified that this consisted of non-

physical tasks such as feeding patients. The trial court also pointed out in its findings that "it was September 21st, several months after the accident that the plaintiff did have the rotator cuff surgery." However, she was *referred to* orthopedics by Saint Francis Hospital on July 1, just two weeks after the accident. She was clinically diagnosed with the rotator cuff tear at her first appointment on July 21, one month after the accident. We also emphasize that Ms. Payne complained of severe pain in her right shoulder blade the morning after the accident.

Like Dr. Dalal, we recognize the possibility that Ms. Payne could have suffered some other type of injury to her shoulder aside from the auto accident. However, the clear weight of the evidence suggests otherwise. For the evidence to preponderate against the trial court's finding, it must support another finding "with greater convincing effect." *Branch Banking & Tr. Co. v. Hill*, 582 S.W.3d 221, 229 (Tenn. Ct. App. 2019) (quoting *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2006)). That is the case here. We conclude that the evidence preponderates against the trial court's finding as to causation and conclude that it supports a finding that Ms. Payne's rotator cuff was torn during the collision.[5]

Finally, we recognize that most of the stated reasons the trial court gave for its decision related to Ms. Payne's medical records and the deposition testimony of Dr. Dalal. Aside from describing the accident and noting the nature of Ms. Payne's job, the court really did not discuss the testimony of Ms. Payne or the other live witnesses in relation to its finding as to causation. It also did not make any express credibility findings. This was not a situation in which the trial court chose to believe one witness or expert witness over another, as Shelby County did not call any witnesses, and there was no conflicting testimony as to causation. Thus, it is difficult to discern the extent to which the trial court's conclusion as to causation may have been based on implicit credibility findings as to the live witnesses at trial. We acknowledge that appellate courts "are required to defer to the trial court's credibility findings, including those that are implicit in its holdings." *Williams v. City of Burns*, 465 S.W.3d 96, 120 (Tenn. 2015) (citing *Richards v. Liberty Mut. Ins. Co.*, 70 S.W.3d 729, 733-34 (Tenn. 2002); *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779,

---

[5] We note that this Court has decided several other cases involving whether auto accidents caused similar shoulder injuries, with varying results based on our standard of review and the particular evidence presented. *See, e.g.*, *Hampton v. Nw. Tennessee Hum. Res. Agency*, No. W2009-02668-COA-R3-CV, 2010 WL 2754347, at *1, *6 (Tenn. Ct. App. July 13, 2010) (affirming a trial court's finding, after a bench trial, that the plaintiff's torn rotator cuff was caused by a low speed collision outside a doctor's office in which a van backed into the car plaintiff was driving, resulting in a cracked headlight on her car and a dent on the van's bumper, and the plaintiff had pain in her shoulder beginning the next day); *but see Almuawi v. Gregory*, No. M2020-01018-COA-R3-CV, 2021 WL 2226624, at *1-4 (Tenn. Ct. App. June 2, 2021) (affirming a jury verdict that a rear-end collision did not cause the plaintiff's labral tear in his shoulder where he did not complain of shoulder pain until nearly a month after the accident); *Daniel v. Smith*, No. M2011-00830-COA-R3-CV, 2012 WL 4503196, at *1-4 (Tenn. Ct. App. Sept. 28, 2012) (finding material evidence to support a jury verdict declining to award damages for a rotator cuff/shoulder injury where there was evidence to suggest it may have been caused by a separate car accident).

783-84 (Tenn. 1999); *Seals v. England/Corsair Upholstery Mfg. Co., Inc.*, 984 S.W.2d 912, 915 (Tenn. 1999)). However, "[e]ven if we assume that the trial court made an implicit credibility determination, a determination to which we give great deference, a trial court's credibility determination may be reversed when other real evidence compels a contrary conclusion." *Sharp v. Stevenson*, No. W2009-00096-COA-R3-CV, 2010 WL 786006, at *5 (Tenn. Ct. App. Mar. 10, 2010); *see also Wright Med. Tech., Inc. v. Grisoni*, 135 S.W.3d 561, 582 (Tenn. Ct. App. 2001) ("Where there is conflict in the testimony that requires a determination of the credibility of a witness, the trial court's finding is binding on the appellate court unless from other real evidence the appellate court is compelled to conclude to the contrary.") (quotation omitted). After carefully reviewing the entirety of the evidence presented below, we are compelled to reach a different result. We know that the trial court's decision was based on its erroneous factual findings as to the absence of any complaints of shoulder pain by Ms. Payne in the two weeks following the accident and at physical therapy, and those findings, and any underlying implicit adverse credibility determinations related to whether she reported shoulder pain, are clearly disproved by the medical records, which are in accord with her testimony. So, we conclude that the trial court's related factual finding as to causation is clearly erroneous, even if it was based on an implicit credibility determination.

We reverse the trial court's determination that the right shoulder injury was unrelated to the accident at issue. On remand, the trial court should determine the amount of damages to be awarded in relation to the shoulder injury.

## IV.  CONCLUSION

For the aforementioned reasons, the decision of the trial court is hereby affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. Costs of this appeal are taxed equally to the appellant, Jacqueline Payne, and to the appellee, Shelby County, Tennessee, for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE